Filed 5/26/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
             )
        Plaintiff and Respondent, )
             )         S217699
        v. )
             )     Ct.App. 1/3 A135607
TYRIS LAMAR FRANKLIN, )
             )      Contra Costa County
        Defendant and Appellant. )   Super. Ct. No. 05-110301-9
_____ )

      Defendant Tyris Lamar Franklin was 16 years old at the time he shot and killed another teenager. A jury convicted Franklin of first degree murder and found true a personal firearm-discharge enhancement. The trial court was obligated by statute to impose two consecutive 25-year-to-life sentences, so Franklin's total sentence was life in state prison with the possibility of parole after 50 years.

      After Franklin was sentenced, the United States Supreme Court held that the Eighth Amendment to the federal Constitution prohibits a mandatory life without parole (LWOP) sentence for a juvenile offender who commits homicide. (*Miller v. Alabama* (2012) 567 U.S. __, __ [132 S.Ct. 2455, 2460] (*Miller*).) Shortly thereafter, we held in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*) that the prohibition on life without parole sentences for all juvenile nonhomicide offenders established in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) applied to sentences that were the "functional equivalent of a life

~ SEE CONCURRING AND DISSENTING OPINION ~

without parole sentence," including Caballero's term of 110 years to life. (*Caballero*, at p. 268.) Franklin challenges the constitutionality of his 50-year-to-life sentence under these authorities.

We granted review to answer two questions: Does Penal Code section 3051 moot Franklin's constitutional challenge to his sentence by requiring that he receive a parole hearing during his 25th year of incarceration? If not, then does the state's sentencing scheme, which required the trial court to sentence Franklin to 50 years to life in prison for his crimes, violate *Miller*'s prohibition against mandatory LWOP sentences for juveniles?

We answer the first question in the affirmative: Penal Code sections 3051 and 4801 — recently enacted by the Legislature to bring juvenile sentencing in conformity with *Miller*, *Graham*, and *Caballero* — moot Franklin's constitutional claim. Consistent with constitutional dictates, those statutes provide Franklin with the possibility of release after 25 years of imprisonment (Pen. Code, § 3051, subd. (b)(3)) and require the Board of Parole Hearings (Board) to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (*id.*, § 4801, subd. (c)). In light of this holding, we need not decide whether a life sentence with parole eligibility after 50 years of incarceration is the functional equivalent of an LWOP sentence and, if so, whether it is unconstitutional in Franklin's case.

Although Franklin's constitutional claim has been mooted by the passage of Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill No. 260), he raises colorable concerns as to whether he was given adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth. The criteria for parole suitability set forth in Penal Code sections 3051 and 4801 contemplate that the Board's decisionmaking at Franklin's eventual parole hearing will be informed by

2

youth-related factors, such as his cognitive ability, character, and social and family background at the time of the offense.  Because Franklin was sentenced before the high court decided *Miller* and before our Legislature enacted Senate Bill No. 260, the trial court understandably saw no relevance to mitigation evidence at sentencing.  In light of the changed legal landscape, we remand this case so that the trial court may determine whether Franklin was afforded sufficient opportunity to make such a record at sentencing.  This remand is necessarily limited; as section 3051 contemplates, Franklin's two consecutive 25-years-to-life sentences remain valid, even though the statute has made him eligible for parole during his 25th year of incarceration.

## I.

On January 10, 2011, Franklin, at age 16, murdered another 16-year-old boy, Gene Grisby.  Over the course of a one-year period preceding the crime, Franklin had been involved in numerous and increasingly dangerous altercations with a group of boys who lived in the Crescent Park housing project in Richmond and referred to themselves as the "Crescent Park gang."  At first, Franklin engaged in fistfights with members of the Crescent Park gang, including Gene and another juvenile named Kian.  But the boys soon began to arm themselves.  According to Franklin and his grandmother, Crescent Park gang members had fired multiple gunshots into his home while his family was inside.  Franklin believed that Gene associated with the individuals responsible for this incident.  Crescent Park gang members had also shot the windows out of Franklin's mother's car and slashed her tires.  Franklin also testified that the Friday before the murder, Kian and another Crescent Park gang member had come to his classroom, where Kian pulled up his shirt to display a gun on his hip.  Franklin saw this gesture as a serious threat.

After the incident at school, Franklin told his older brother, Demond, that Kian had threatened him with a gun at school.  This prompted Demond to loan

3

him a .22-caliber pistol for protection the following Monday morning, the day of the murder. That same day, Kian and other Crescent Park gang members attacked Franklin's 13-year-old brother, Terrell. The attackers told Terrell that they were also looking for Franklin. Demond called Franklin to inform him that Terrell had been attacked.

After learning about the attack, Franklin told his friends that Terrell had been "jumped" and asked an older teenager for a ride to the Crescent Park housing complex. Franklin testified at trial that he was angry and afraid for his family. He did not know what the Crescent Park gang was going to do next and wanted to confront them. According to Franklin, he did not plan to shoot anyone but knew there was a "possibility that I might."

Upon arriving at the housing complex, Franklin spotted Gene walking on a street and asked the driver to unlock the car door. Another passenger in the car, Khalifa, asked: "Why we riding up on Gene when he don't have anything to do with the situation?" According to Khalifa, Franklin answered something like, "It don't matter. He is from the Crescents" or "It doesn't matter. They beat up my brother." According to another passenger, Jaswinder, Franklin said something like, "It doesn't matter. He's still from Crescent Park."

As Franklin exited the car, he pulled the .22-caliber pistol from his waistband. According to a witness who observed the murder from a balcony across the street, Franklin walked around the car and, without saying anything, shot Gene several times. The witness testified that Franklin began shooting "shortly after he got out of the car" and before he reached Gene. Jaswinder and Khalifa also did not hear any conversation between Franklin and Gene before Franklin began shooting.

Franklin testified that as he approached Gene, he asked, "Which one of you motherfuckers just jumped my little brother?" Gene replied, "Fuck you and fuck

4

your little brother." Franklin testified that Gene's response angered him and made him feel "numb." According to Franklin: "It was like — it was so much. It was, it was like everything just — I don't know, just — it just, I don't know. Like, I — I wasn't in my body no more. It was like I don't remember everything like." After shooting Gene, Franklin got back into the car, and the car sped off. Inside the car, Franklin said something like, "That Crescent Park dude is a sucker."

Gene's aunt testified that when she heard the gunshots, she looked out the window of the apartment where she and Gene lived and saw a young man with a handgun fire multiple shots. A few minutes later, Gene ran through the front door of the apartment, holding his right shoulder exclaiming, "I've been hit," before collapsing on the floor. Richmond police responded to the shooting and found Gene on the floor of his apartment with multiple gunshot wounds to his head and body. Gene was pronounced dead at the scene.

The district attorney charged Franklin with first degree murder under Penal Code section 187 and alleged a personal firearm-discharge enhancement under Penal Code section 12022.53, subdivision (a)(1). (All undesignated statutory references are to the Penal Code.) Because Franklin was charged with murder and was 16 years of age at the time of the offense, the district attorney exercised his discretion to file charges directly in criminal court rather than juvenile court. (Welf. & Inst. Code, § 707, subds. (b), (d).) A jury convicted Franklin of first degree murder and found true the firearm-personal discharge allegation.

At sentencing, Franklin apologized for his crime: "I do want to say I'm sorry, but sorry is a simple word, though. I didn't have no thoughts about killing him, you know. I don't know. It's hard to explain. But I do want to apologize to the family for taking your son, and I do want to apologize to my mother for taking me away from her and my family. I want to say sorry, but, like I said, sorry is . . . sorry can't explain the way I feel. Like you said you can't sleep at night. I can't

5

sleep at night, either. I haven't been able to sleep at night for a lot of years now, you know. I'm not good with emotion, so I'm . . . I really wish this didn't happen. I wish I could have found another way, but, like I said, I want to say sorry, but sorry is just — I don't know no other words to use. I don't know. I don't know. I'd like to say sorry to my mother, too. I would like to say sorry to each and every one of you all for what I did."

The trial court imposed a mandatory sentence of 25 years to life for the murder (§ 190, subd. (a)) and a mandatory consecutive sentence of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) for a total term of 50 years to life. Explaining the sentence, the court said: "The sentence is the sentence that's prescribed by law, not one that the Court chooses. And I will impose it in this case, but first I just want to say a couple of words to both families. I see a lot of pain in this courtroom all the time. And so often it's because of senseless things that happen. And if there's a senseless case, this is a senseless case. We've got two young men's lives destroyed. . . . We've lost two young men. And for what? It's so senseless. I would have loved to have seen these two young men grow up to be people, to be the people they're supposed to be, both of them. And neither of them is going to have that opportunity. It's because of unspeakably stupid choices that you made, Mr. Franklin. And I just hope that something can come out of this that's productive. I'm impressed with Gene['s] . . . family's dignity going through this. Their empathy for Mr. Franklin's family and even Mr. Franklin. And I'm impressed with Mr. Franklin's family's understanding and empathy for [Gene]'s family. And if we can take something from this, I would love for it to be, get the guns out of Richmond, get the violence out of Richmond, and don't have these young black men going after each other because we see it so much in this courthouse. And what ends up happening is we have some young men going to prison for the best years of their lives at the least, and other young men who don't

6

get to grow up. And how crazy is this? How crazy. So if both families can do anything to try to make some sense and find some good out of this, work together to try to get the guns out of Richmond, get the guns out of the pockets of these young men who haven't got the frontal lobes yet to figure out how to deal with their issues."

Franklin appealed, arguing that the trial court made numerous instructional and evidentiary errors and that, because he was 16 years old when he committed the crime, his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment as interpreted in *Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455]. The Court of Appeal affirmed Franklin's conviction and sentence. The court assumed without deciding that "the sentence, when imposed, violated the Eighth Amendment and that had there been no intervening developments, remand for resentencing would have been required." But the court held that "any potential constitutional infirmity in [defendant's] sentence has been cured by the subsequently enacted Penal Code section 3051, which affords youth offenders a parole hearing sooner than had they been an adult." Thus, "defendant's sentence is no longer the functional equivalent of an LWOP sentence and no further exercise of discretion at this time is necessary."

We granted review.

## II.

As the trial court noted, Franklin's sentence was statutorily mandated at the time it was imposed. The interaction of two features of California law gives rise to the possibility of mandatory lengthy sentences for juvenile offenders: (1) statutes authorizing and sometimes requiring a criminal court to exercise jurisdiction over juvenile offenders and (2) statutes restricting the trial court's discretion to impose concurrent sentences or to strike certain sentencing enhancements.

7

Under Welfare and Institutions Code section 707, subdivision (d)(1), the district attorney may file an accusatory pleading in criminal court without first seeking authorization from a juvenile court in cases where "a minor 16 years of age or older is accused of committing one of the violent or serious offenses enumerated in section 707, subdivision (b)," including murder. Here the district attorney filed an accusatory pleading in criminal court because Franklin was a 16 year old accused of committing murder.

Once a juvenile offender is tried and convicted in criminal court, the trial court may be statutorily obligated to impose a lengthy sentence. In this case, the jury convicted Franklin of first degree murder (§ 187) and found true an enhancement for the personal and intentional discharge of a firearm that proximately caused great bodily injury or death (§ 12022.53, subd. (d)). Section 190, subdivision (a) required the trial court to impose a term of 25 years to life for the murder, and section 12022.53, subdivision (d) required "an additional and consecutive term of imprisonment" of 25 years to life. Although section 1385, subdivision (c) provides trial courts with discretion to dismiss or strike the additional punishment associated with an offense or enhancement "in furtherance of justice," section 12022.53, subdivision (h) prohibits trial courts from striking a firearm enhancement. (See *People v. Chiu* (2003) 113 Cal.App.4th 1260, 1265.) The court was therefore required by statute to sentence Franklin to two consecutive terms of 25 years to life.

Section 3046, subdivision (a)(2) provides that an individual serving a life sentence may not be paroled until he has served the "minimum term or minimum period of confinement under a life sentence before eligibility for parole." Section 3046, subdivision (b) further provides that where, as here, two or more life sentences are ordered to run consecutively, the inmate may not be paroled "until he or she has served the term specified in subdivision (a) on each of the life

8

sentences."  In essence, where two indeterminate sentences run consecutively, a defendant must serve the full minimum term of each before becoming eligible for parole.  (See *People v. Felix* (2000) 22 Cal.4th 651, 656.)  The minimum term of Franklin's sentence for murder is 25 years, as is the minimum term of his sentence for the firearm enhancement.  Thus, Franklin would first become eligible for parole after 50 years of imprisonment at the age of 66.

## III.

Franklin claims that this sentence violates the Eighth Amendment because it is effectively a term of life without parole imposed by statute, without judicial consideration of his youth and its relevance for sentencing.  This claim is grounded in a series of United States Supreme Court cases assigning constitutional significance to characteristics of youth long known to common sense and increasingly substantiated through science.

## A.

The Eighth Amendment prohibition on cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." (*Roper v. Simmons* (2005) 543 U.S. 551, 560 (*Roper*); see *Robinson v. California* (1962) 370 U.S. 660, 667 [Eighth Amend. is binding on the states through the 14th Amend.].)  This prohibition encompasses the "foundational principle" that the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2466].)  From this principle, the high court has derived a number of limitations on juvenile sentencing:  (1) no individual may be executed for an offense committed when he or she was a juvenile (*Roper*, at p. 578); (2) no juvenile who commits a nonhomicide offense may be sentenced to LWOP (*Graham*, *supra*, 560 U.S. at p. 74); and (3) no juvenile who commits a homicide

9

offense may be automatically sentenced to LWOP (*Miller*, at p. __ [132 S.Ct. at p. 2460]).

*Miller* addressed two cases, each of which involved a 14-year-old offender tried as an adult, convicted of murder, and sentenced to LWOP under a state law that did not allow the sentencing authority to impose a less severe punishment. In prohibiting such mandatory LWOP sentences, the high court in *Miller* affirmed and amplified its observations in *Graham* and *Roper* that children are "constitutionally different . . . for purposes of sentencing" for several reasons based "not only on common sense — on what 'any parent knows' — but on science and social science as well." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2464]; see *id.* at p. __ [132 S.Ct. at p. 2464, fn. 5] ["the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger"].) "First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. . . . Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. . . . And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Ibid.*, citations omitted.)

These "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because ' "[t]he heart of the retribution rationale" ' relates to an offender's blameworthiness, ' "the case for retribution is not as strong with a minor as with an adult." ' . . . Nor can deterrence do the work in this context, because ' "the same characteristics that render juveniles less culpable than adults" ' — their immaturity, recklessness, and impetuosity — make them less

10

likely to consider potential punishment. . . . Similarly, incapacitation could not support the life-without-parole sentence in *Graham*: Deciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible' — but ' "incorrigibility is inconsistent with youth." ' . . . And for the same reason, rehabilitation could not justify that sentence. Life without parole 'forswears altogether the rehabilitative ideal.' . . . It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465], citations omitted.)

*Miller* also relied on cases that have "elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2467], citing *Woodson v. North Carolina* (1976) 428 U.S. 280 and related cases.) These cases were relevant, the high court explained, because *Graham* had "likened life without parole for juveniles to the death penalty itself." (*Miller*, at p. __ [132 S.Ct. at p. 2463]; see *id*. at p. __ [132 S.Ct. at p. 2466] ["Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.' [*Graham*, *supra*, 560 U.S. at p. 69.]"].)

Based on the "confluence" of the considerations above, the high court concluded that "in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." (*Miller*, *supra*, 567 U.S. at pp. __, __ [132 S.Ct. at pp. 2464, 2468].) *Miller* thus held that a state may not require a sentencing authority to impose LWOP on juvenile homicide offenders; the sentencing authority must have individualized discretion to impose a less severe sentence and, in exercising that discretion, must take into account a wide array of youth-related mitigating factors. (*Id.* at pp. __–__ [132 S.Ct. at pp. 2468–2469].)

11

While declining to decide whether "the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger" (*id.* at p. __ [132 S.Ct. at p. 2469]), the high court concluded by saying: "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Ibid.*)

**B.**

Since *Graham* and *Miller*, courts throughout the country have examined whether the high court's restrictions on LWOP sentences apply to lengthy sentences with a release date near or beyond a juvenile's life expectancy. In *Caballero*, we held that the defendant's 110-year sentence was the "functional equivalent" of life without parole and thus violated *Graham*'s prohibition against LWOP sentences for juvenile offenders convicted of nonhomicide crimes. (*Caballero*, *supra*, 55 Cal.4th at p. 268; see *Sumner v. Shuman* (1987) 483 U.S. 66, 83 ["there is no basis for distinguishing . . . between an inmate serving a life sentence without possibility of parole and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy."].) But we did not further elaborate what it means for a sentence to be the "functional equivalent" of LWOP, and we left open how our holding should be applied in the case of a juvenile homicide offender. (*Caballero*, at p. 268, fn. 4.)

12

We now hold that just as *Graham* applies to sentences that are the "functional equivalent of a life without parole sentence" (*Caballero*, *supra*, 55 Cal.4th at p. 268), so too does *Miller* apply to such functionally equivalent sentences. As we noted in *Caballero*, *Miller* "extended *Graham*'s reasoning" to homicide offenses, observing that " 'none of what [*Graham*] said about children— about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.' " (*Caballero*, at p. 267, quoting *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465].) Because sentences that are the functional equivalent of LWOP implicate *Graham*'s reasoning (*Caballero*, at p. 268), and because " '*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile' " whether for a homicide or nonhomicide offense (*id.* at p. 267, quoting *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465]), a sentence that is the functional equivalent of LWOP under *Caballero* is subject to the strictures of *Miller* just as it is subject to the rule of *Graham*. In short, a juvenile may not be sentenced to the functional equivalent of LWOP for a homicide offense without the protections outlined in *Miller*.

## IV.

As noted, Franklin would first become eligible for parole at age 66 under the sentence imposed by the trial court. That sentence was mandatory; the trial court had no discretion to consider Franklin's youth as a mitigating factor. According to Franklin, the 50-year-to-life sentence means he will not experience any substantial period of normal adult life; instead, he will either die in prison or have the possibility of geriatric release. He contends that his sentence is the "functional equivalent" of LWOP (*Caballero*, *supra*, 55 Cal.4th at p. 268) and that it was imposed without the protections set forth in *Miller*.

After Franklin's sentencing, the Legislature passed Senate Bill No. 260, which became effective January 1, 2014, and added sections 3051, 3046,

13

subdivision (c), and 4801, subdivision (c) to the Penal Code. The Attorney General contends these new provisions entitle Franklin to a parole hearing during his 25th year in prison and thus renders moot any infirmity in Franklin's sentence under *Miller*. We agree with the Attorney General: Senate Bill No. 260 has mooted Franklin's claim under *Miller*. As explained below, section 3051 has superseded Franklin's sentence so that notwithstanding his original term of 50 years to life, he is eligible for a "youth offender parole hearing" during the 25th year of his sentence. Crucially, the Legislature's recent enactment also requires the Board not just to consider but to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).) For those juvenile offenders eligible for youth offender parole hearings, the provisions of Senate Bill No. 260 are designed to ensure they will have a meaningful opportunity for release no more than 25 years into their incarceration.

Our interpretation of section 3051 begins with the recognition that the Legislature passed Senate Bill No. 260 explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*. Section 1 of the enactment states in part: "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.E.2d 407. . . . It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Stats.

14

2013, ch. 312, § 1.) Since its passage, the statute and associated Penal Code provisions have been amended to apply to offenders sentenced to state prison for crimes committed when they were under 23 years of age. (Stats. 2015, ch. 471.)

At the heart of Senate Bill No. 260 was the addition of section 3051, which requires the Board to conduct a "youth offender parole hearing" during the 15th, 20th, or 25th year of a juvenile offender's incarceration. (§ 3051, subd. (b).) The date of the hearing depends on the offender's "controlling offense," which is defined as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (*Id.*, subd. (a)(2)(B).) A juvenile offender whose controlling offense carries a term of 25 years to life or greater is "eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (*Id.*, subd. (b)(3).) The statute excludes several categories of juvenile offenders from eligibility for a youth offender parole hearing: those who are sentenced under the Three Strikes Law (§§ 667, subds. (b)–(i), 1170.12) or Jessica's Law (§ 667.61), those who are sentenced to life without parole, and those who commit another crime "subsequent to attaining 23 years of age . . . for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison." (§ 3051, subd. (h); see Stats. 2015, ch. 471, § 1 [changing the age after which malice aforethought crimes are disqualifying from 18 to 23].)

Section 3051 thus reflects the Legislature's judgment that 25 years is the maximum amount of time that a juvenile offender may serve before becoming eligible for parole. Apart from the categories of offenders expressly excluded by the statute, section 3051 provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration. The statute establishes what is, in the Legislature's view, the appropriate time to determine whether a juvenile

15

offender has "rehabilitated and gained maturity" (Stats. 2013, ch. 312, § 1) so that he or she may have "a meaningful opportunity to obtain release" (§ 3051, subd. (e)).

Sections 3051 and 3046 have thus superseded the statutorily mandated sentences of inmates who, like Franklin, committed their controlling offense before the age of 18. The statutory text makes clear that the Legislature intended youth offender parole hearings to apply retrospectively, that is, to all eligible youth offenders regardless of the date of conviction. Section 3051, subdivision (b) makes eligible all persons "convicted of a controlling offense that was committed before the person had attained 23 years of age." In addition, section 3051, subdivision (i) says: "The board shall complete all youth offender parole hearings for individuals who become entitled to have their parole suitability considered at a youth offender parole hearing on the effective date of this section by July 1, 2015." This provision would be meaningless if the statute did not apply to juvenile offenders already sentenced at the time of enactment.

The Legislature did not envision that the original sentences of eligible youth offenders would be vacated and that new sentences would be imposed to reflect parole eligibility during the 15th, 20th, or 25th year of incarceration. The continued operation of the original sentence is evident from the fact that an inmate remains bound by that sentence, with no eligibility for a youth offender parole hearing, if "subsequent to attaining 23 years of age" the inmate "commits an additional crime for which malice aforethought is a necessary element . . . or for which the individual is sentenced to life in prison." (§ 3051, subd. (h); Stats. 2015, ch. 471.) But section 3051 has changed the manner in which the juvenile offender's original sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole. The Legislature has effected this change by operation of law, with no additional

16

resentencing procedure required. (Cf. *State v. Mares* (Wyo. 2014) 335 P.3d 487, 498 [holding that a similar statute had "converted" juvenile offenders' sentences "by the operation of the amended statutes" regardless of when those juveniles were originally sentenced, and that no judicial intervention was required to effectuate their new parole eligibility].)

In this case, the trial court sentenced Franklin to a mandatory term of 25 years to life under section 190 for first degree murder and to a consecutive mandatory term of 25 years to life under section 12022.53 on the firearm enhancement. Either the homicide offense or the firearm enhancement could be considered the "controlling offense" under section 3051, subdivision (a)(2)(B). Regardless of which is considered controlling, Franklin is a "person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life." (§ 3051, subd. (b)(3).) As such, Franklin "shall be eligible for release on parole by the board during his . . . 25th year of incarceration at a youth offender parole hearing." (*Ibid.*)

Franklin does not argue that a life sentence with parole eligibility during his 25th year of incarceration, when he will be 41 years old, is the functional equivalent of LWOP. We conclude that such a sentence is not the functional equivalent of LWOP, and we are not aware of any court that has so held. Instead, Franklin urges us to conclude that his 50-year-to-life sentence is the functional equivalent of LWOP and, in light of that conclusion, to "construe [section 12022.53, subdivision (h)'s] prohibition on striking section 12022.53 enhancements as inapplicable to cases involving juvenile offenders, in which imposition of the enhancement would result in a functional life without parole sentence." He seeks relief in the form of resentencing whereby the trial court would strike the firearm enhancement and impose only a single term of 25 years to

life for the first degree murder. But we see no basis for rewriting section 12022.53, subdivision (h)'s prohibition on striking firearm allegations in light of the Legislature's determination that inmates such as Franklin, despite the mandatory character of their original sentences, are now entitled to a youth offender parole hearing during their 25th year of incarceration. Even if section 12022.53, subdivision (h) could be construed to authorize the trial court to strike the firearm enhancement, it is not clear how the imposition of a single term of 25 years to life for first degree murder would put Franklin in a better or different position, from the standpoint of *Miller*'s concerns, than section 3051's requirement of a youth offender parole hearing during his 25th year of incarceration.

In sum, the combined operation of section 3051, section 3046, subdivision (c), and section 4801 means that Franklin is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because Franklin is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here. The Legislature's enactment of Senate Bill No. 260 has rendered moot Franklin's challenge to his original sentence under *Miller*.

Our mootness holding is limited to circumstances where, as here, section 3051 entitles an inmate to a youth offender parole hearing against the backdrop of an otherwise lengthy mandatory sentence. We express no view on *Miller* claims by juvenile offenders who are ineligible for such a hearing under section 3051, subdivision (h), or who are serving lengthy sentences imposed under discretionary rather than mandatory sentencing statutes.

## V.

Franklin and amicus curiae Post-Conviction Justice Project of the University of Southern California Gould School of Law (PCJP) advance a number

18

of arguments against the conclusion that his *Miller* claim is moot.  In addition, Franklin has requested that we take judicial notice of four amicus curiae briefs filed in *In re Alatriste* (review granted Feb. 19, 2014, S214652) and *In re Bonilla* (review granted Feb. 19, 2014, S214960).  " 'A court may take judicial notice of the [e]xistence of each document in a court file, but can only take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments.' " (*Day v. Sharp* (1975) 50 Cal.App.3d 904, 914, italics omitted; see Evid. Code, § 452, subd. (d) ["Records of . . . any court of this state" are among the matters that may be judicially noticed].)  Because Franklin does not argue that the existence (as opposed to the content) of these briefs is relevant here, we deny his request for judicial notice.

## A.

Franklin relies on our reasoning in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1386–1387 (*Gutierrez*), that the availability of a procedure under section 1170, subdivision (d)(2) to petition for recall an LWOP sentence after a juvenile offender has served 15 years in prison does not remedy the constitutional difficulty under *Miller* of applying a presumption in favor of LWOP under section 190.5, subdivision (b) in cases of special circumstance murder.  In *Gutierrez*, the Attorney General argued that section 1170, subdivision (d)(2) "eliminate[d] any constitutional problems" arising from an otherwise unconstitutional LWOP sentence because the possibility of recall and resentencing converted the juvenile's sentence to a term other than LWOP.  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1384.)  We rejected this contention and held that "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to — not as an after-the-fact corrective for — '*making the judgment at the outset* that those offenders never will be fit to reenter society.' " (*Gutierrez*, *supra*, 58 Cal.4th at p. 1386, quoting *Graham*, *supra*, 560 U.S. at

19

p. 75.)  According to Franklin, section 3051, like section 1170, subdivision (d)(2), does not satisfy the mandate of *Miller* because it permits a trial court to abdicate its responsibility to ensure that a juvenile offender's sentence comports with the Eighth Amendment " 'at the outset.' " (*Gutierrez*, *supra*, 58 Cal.4th at p. 1386, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

But this argument misses a crucial difference between section 3051 and section 1170, subdivision (d)(2).  Section 1170, subdivision (d)(2)(A)(i) provides that a juvenile offender sentenced to LWOP may, after serving at least 15 years of that sentence, "submit to the sentencing court a petition for recall and resentencing."  If sentencing court determines "by a preponderance of the evidence that the statements in the petition are true," the court "shall hold a hearing to consider whether to recall the sentence . . . and to resentence the defendant" to a term not exceeding that of the defendant's original sentence. (§ 1170, subd. (d)(2)(E).)  In deciding whether to recall the sentence and resentence the defendant, the statute instructs the court to consider a variety of factors addressing his culpability for the original offense and efforts toward rehabilitation.  (§ 1170, subd. (d)(2)(F).)  If the court does not recall the sentence, the defendant may petition again after serving 20 years and, if unsuccessful, again after serving 24 years.  (§ 1170, subd. (d)(2)(H).)

Section 3051, by contrast, effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years.  Section 1170, subdivision (d)(2) has no similar effect on a juvenile offender's LWOP sentence; it provides that a juvenile offender may, after serving 15 years of an LWOP sentence, petition a court for recall of the original sentence.  In *Gutierrez*, the trial court had imposed an LWOP sentence without considering youth-based mitigating factors in the manner required by *Miller*; Gutierrez was sentenced under a scheme that

20

presumed his incorrigibility " 'at the outset,' " and the resulting sentence would remain in effect unless and until he filed a successful petition for recall. (*Gutierrez, supra*, 58 Cal.4th at p. 1386–1387; see *id.* at p. 1386 ["A sentence of life without parole under section 190.5(b) remains *fully effective* after the enactment of section 1170(d)(2)."].) Franklin is not subject to a sentence that presumes his incorrigibility; by operation of law, he is entitled to a parole hearing and possible release after 25 years of incarceration. Unlike Gutierrez, Franklin is not serving an LWOP sentence or its functional equivalent, so the constitutional requirements for properly evaluating a juvenile offender's incorrigibility " 'at the outset' " do not apply here. (*Ibid.*)

**B.**

Franklin contends that because "the youthful parole hearing system is completely administrative," it cannot fulfill *Miller*'s mandate that a judge consider the relevance of his youth for sentencing. But the relief Franklin himself seeks — a remand for resentencing to a single term of 25 years to life on the murder charge — would still mean that his ultimate release date will be determined by an administrative decisionmaker. *Miller* did not restrict the ability of states to impose life *with* parole sentences on juvenile offenders; such sentences necessarily contemplate that a parole authority will decide whether a juvenile offender is suitable for release.

**C.**

Although nothing in *Miller* prohibits reliance on an administrative hearing to determine Franklin's ultimate release date, Franklin contends that the statutory scheme does not set forth adequate procedures to ensure a "meaningful opportunity for release" (§ 3051, subd. (e)) and that his sentence, even with parole eligibility during his 25th year of incarceration, thus remains the functional equivalent of a mandatory LWOP sentence imposed in violation of *Miller*. Senate

21

Bill No. 260 directs the administrative entity that will determine if and when Franklin is released to "give great weight" (§ 4801, subd. (c)) to the salient characteristics of youth outlined in *Miller*, *Graham*, and *Caballero*. Franklin argues that the Board will not be able to give great weight to these characteristics at a youth offender parole hearing because "there would be no reliable way to measure his cognitive abilities, maturity, and other youth factors when the offense was committed 25 years prior."

Franklin notes that his own sentencing proceeding resulted in a record that may be incomplete or missing mitigation information because the trial court deemed such information irrelevant to its pronouncement of his mandatory sentence. Franklin was sentenced in 2011, before the high court's decision in *Miller* and before our Legislature's enactment of Senate Bill No. 260 in response to *Miller*, *Graham*, and *Caballero*. When Franklin's attorney did not receive a probation report until the morning of sentencing, the trial court acknowledged that this delay would ordinarily merit a continuance. But the court, recognizing that it lacked discretion in sentencing Franklin, proceeded with sentencing and allowed the defense to submit mitigation information at a later date. At the post sentencing hearing where these materials were submitted, Franklin's attorney raised concerns about the record at his eventual parole hearing. In response, the trial court said, "it sort of doesn't matter because the statute mandates the sentence here. So there's no basis and occasion for any findings to be made on aggravation and mitigation at all." The court eventually admitted a mitigating statement submitted by Franklin and a handwritten note from his mother. But the court expressed "misgiving" that because of the mandatory sentences, "[a]t no point in the process is anyone, other than the district attorney's office, ever able to really consider that this is a juvenile."

22

The Legislature has declared that "[t]he youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release" (§ 3051, subd. (e)) and that in order to provide such a meaningful opportunity, the Board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (§ 4801, subd. (c)). These statutory provisions echo language in constitutional decisions of the high court and this court. (See *Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468] ["chronological age and its hallmark features"]; *Graham*, *supra*, 560 U.S. at p. 75 ["meaningful opportunity to obtain release"]; *Roper*, *supra*, 543 U.S. at p. 571 ["diminished culpability of juveniles"]; accord, *Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4.) The core recognition underlying this body of case law is that children are, as a class, "constitutionally different from adults" due to "distinctive attributes of youth" that "diminish the penological justifications for imposing the harshest sentences on juvenile offenders." (*Miller*, at p. __ [132 S.Ct. at p. 2458].) Among these "hallmark features" of youth are "immaturity, impetuosity, and failure to appreciate risks and consequences," as well as the capacity for growth and change. (*Id.* at pp. __, __ [132 S.Ct. at pp. 2465, 2468].) It is because of these "marked and well understood" differences between children and adults (*Roper*, at p. 572) that the law categorically prohibits the imposition of certain penalties, including mandatory LWOP, on juvenile offenders. (*Montgomery v. Louisiana* (2016) 577 U.S.__, __–__ [136 S.Ct. 718, 732–737].)

In directing the Board to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner" (§ 4801, subd. (c)), the statutes also contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a

23

youth offender parole hearing to facilitate the Board's consideration. For example, section 3051, subdivision (f)(2) provides that "[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime . . . may submit statements for review by the board." Assembling such statements "about the individual before the crime" is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away. In addition, section 3051, subdivision (f)(1) provides that any "psychological evaluations and risk assessment instruments" used by the Board in assessing growth and maturity "shall take into consideration . . . any subsequent growth and increased maturity of the individual." Consideration of "subsequent growth and increased maturity" implies the availability of information about the offender when he was a juvenile.

It is not clear whether Franklin had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing. Thus, although Franklin need not be resentenced — as explained (*ante*, at pp. 14–20), Franklin's two consecutive 25-year-to-life sentences remain valid, even though section 3051, subdivision (b)(3) has altered his parole eligibility date by operation of law — we remand the matter to the trial court for a determination of whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing.

If the trial court determines that Franklin did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. Franklin may place on the

24

record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to "give great weight to" youth-related factors (§ 4801, subd. (c)) in determining whether the offender is "fit to rejoin society" despite having committed a serious crime "while he was a child in the eyes of the law" (*Graham*, *supra*, 560 U.S. at p. 79).

### D.

Finally, amicus curiae PCJP contends that despite the announced purpose of Senate Bill No. 260, youth offender parole hearings will not, in practice, "afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' " (*Caballero*, *supra*, 55 Cal.4th at p. 266, quoting *Graham*, *supra*, 560 U.S. at p. 73) and therefore cannot render moot a *Miller* challenge to a lengthy mandatory sentence that is functionally equivalent to LWOP. PCJP's argument subsumes several concerns distinct from those we have considered above.

First, although the Governor, like the Board, is required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law" (§ 4801, subd. (c); see Cal. Const., art. V, § 8; Pen. Code, § 3041.2; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664), PCJP notes that the Governor, in reviewing Board decisions that find persons serving an indeterminate term for murder suitable for parole, has

25

historically reversed such decisions at a very high rate. Second, PCJP observes that judicial review of parole denials is "highly deferential" and limited to determining "whether a modicum of evidence supports the parole suitability decision." (*In re Shaputis* (2011) 53 Cal.4th 192, 221.) Third, PCJP contends that some of the suitability criteria used by the Board run counter to the high court's observations concerning the mitigating attributes of youth. For example, a finding that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense" is a factor tending to show unsuitability (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)(E)), even though "such a motive correlates with hallmark features of youth like 'impetuosity, and failure to appreciate risks and consequences.' " An unstable social history also counts against suitability (*id.*, subd. (c)(3)), even though youth " 'are more vulnerable . . . to negative influences and outside pressures . . . [,] have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings.' (*Miller*, *supra*, at p. __ [132 S.Ct. at p. 2464].)" Fourth, PCJP argues that developing a record of mitigation focused on youth-related attributes for the purpose of a youth offender parole hearing is "unachievable in practice" given resource constraints. And fifth, PCJP contends that juvenile offenders serving lengthy sentences have little access to education and rehabilitative programs that may serve to forestall "the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term." (*Graham*, *supra*, 560 U.S. at p. 79.)

We have no occasion in this case to express any view on the concerns raised by PCJP. As noted, the Legislature enacted Senate Bill No. 260 with "the intent . . . to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Stats. 2013, ch. 312, § 1.) Section 4801, subdivision (c) directs that the Board, in conducting a youth offender parole hearing, "shall give great weight to the

diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." And section 3051, subdivision (e) says: "The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release. The board shall review and, as necessary, revise existing regulations and adopt new regulations regarding determinations of suitability made pursuant to this section, subdivision (c) of Section 4801, and other related topics, consistent with relevant case law, in order to provide that meaningful opportunity for release."

As of this writing, the Board has yet to revise existing regulations or adopt new regulations applicable to youth offender parole hearings. In advance of regulatory action by the Board, and in the absence of any concrete controversy in this case concerning suitability criteria or their application by the Board or the Governor, it would be premature for this court to opine on whether and, if so, how existing suitability criteria, parole hearing procedures, or other practices must be revised to conform to the dictates of applicable statutory and constitutional law. So long as juvenile offenders have an adequate opportunity to make a record of factors, including youth-related factors, relevant to the eventual parole determination, we cannot say at this point that the broad directives set forth by Senate Bill No. 260 are inadequate to ensure that juvenile offenders have a realistic and meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

## CONCLUSION

The high court has made clear that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2466].) "It is for the State, in the first instance, to explore the means and mechanisms for compliance" with this

27

directive. (*Graham*, *supra*, 560 U.S. at p. 75.) The Legislature has devised such a means by enacting section 3051 and related statutes in Senate Bill No. 260. Those statutes have effectively reformed Franklin's statutorily mandated sentence so that he will become eligible for parole, at a hearing that must give great weight to youth-related mitigating factors, during his 25th year of incarceration. By operation of law, Franklin's sentence is not functionally equivalent to life without parole, and the record here does not include evidence that the Legislature's mandate that youth offender parole hearings must provide for a meaningful opportunity to obtain release is unachievable in practice. We thus conclude that Franklin's Eighth Amendment challenge to his original sentence has been rendered moot.

For the reasons above, we affirm Franklin's sentence but remand the matter to the Court of Appeal with instructions to remand to the trial court for the limited purpose of determining whether Franklin was afforded an adequate opportunity to make a record of information that will be relevant to the Board as it fulfills its statutory obligations under sections 3051 and 4801.

LIU, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
CHIN, J.
CORRIGAN, J.
CUÉLLAR, J.
KRUGER, J.

28

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**


Defendant Tyris Lamar Franklin was sentenced to prison for a term of 50 years to life for his conviction of first degree murder using a firearm (Pen. Code, §§ 187, 12022.53),**1** committed when he was 16 years old.  I agree with the majority that the question whether his sentence may be considered the equivalent of life in prison with no possibility of parole (LWOP), and thus subject to United States Constitution Eighth Amendment limits (*Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] (*Miller*)), is moot following the Legislature's passage of legislation giving defendant the opportunity for a youth offender parole hearing after 25 years of incarceration.

I part company with the majority over its further conclusion that we must remand the case "for a determination of whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (Maj. opn., *ante*, at p. 24.)  Notably, the majority does not claim a remand for what might be termed a "baseline hearing" is constitutionally mandated by *Miller*, *supra*, 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455].  Rather, the premise of the majority's remand for a baseline hearing is statutory.  No statute, of course, specifically authorizes such hearings.  The

---

**1**      All further statutory references are to the Penal Code.

1

majority, however, reasons that because the statutory scheme directs the Board of Parole Hearings (Board) to give "great weight to . . . any subsequent growth and increased maturity of the prisoner" (§ 4801, subd. (c)), the statutes "contemplate . . . information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available." (Maj. opn., *ante*, p. 23.)

The Legislature's charge to the Board at future youth offender parole hearings is to give the individual "a meaningful opportunity to obtain release." (§ 3051, subd. (e).) To this end, the Board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity *in accordance with relevant case law*." (§ 4801, subd. (c), italics added.) Family members and others "with knowledge about the individual before the crime or his or her growth and maturity since the time of the crime may submit statements for review by the board." (§ 3051, subd. (f)(2).) But to "contemplate" that such information may be taken into consideration is not to *mandate* procedures to enable the offender at the time of sentence or, for those sentenced before enactment of the statute, years after judgment is final, to make a record of such information, including live testimony and the opportunity for cross-examination, in effect a new sentence hearing. No "relevant case law" (§ 3051, subd. (e); § 4801, subd. (c)) so requires. Indeed, what case law establishes is that youth and immaturity differentiate juvenile offenders from adults and must be taken into account in connection with sentencing; youthful offenders should not be viewed as incorrigible, but subject to growth and maturity. (*Miller*, *supra*, 567 U.S. ___ at p. ___ [183 L.Ed.2d at pp. 419, 420, 132 S.Ct. at p. 2465] [a finding of incorrigibility is " ' "inconsistent with youth" ' " and "at odds with a child's capacity for change"]; *Graham v. Florida* (2010) 560 U.S. 48, 74 [LWOP is incompatible with juvenile offender's "capacity for change"].) Statutory

2

authorization for the Board, in its discretion, to use "psychological evaluations and risk assessment instruments" administered by licensed psychologists (§ 3051, subd. (f)(1)) supports the conclusion the Legislature intended the Board's focus to be on the prisoner's current circumstances, his or her maturity and efforts at rehabilitation, irrespective of the particular factors that may have influenced him or her at the time of the offense. Such assessments and evaluations are viewed as informative of themselves without regard to any baseline of the individual offender.

In sum, I am unpersuaded a youthful offender will be deprived of a "meaningful opportunity to obtain release" (§ 3051, subd. (e)), or that the Board will be unable to fairly consider a youthful offender's diminished culpability, later growth, or increased maturity (§ 4801, subd. (c)), unless we impose on the trial courts a new, judicially created, extra statutory procedure entitling such offenders to a type of penalty phase trial, replete with opposing experts and family members and friends, subject to cross-examination, testifying to the offender's youthful immaturity. The statutory scheme, in my view, does not bear the weight of the majority's conclusion that such a hearing is required to effectuate its purpose of affording a youthful offender a meaningful opportunity to obtain release. Rather, in borrowing the "diminished culpability" of juveniles and the "hallmark features" of youth language from *Miller*, *supra*, 567 U.S. at pages ___ and ___ [183 L.Ed.2d at pp. 418 & 423, 132 S.Ct. at pp. 2464 & 2468], and inserting it in section 4801, subdivision (c), the Legislature signaled its agreement with the United States Supreme Court that those factors are inherent in juveniles and are generally deemed to mitigate the culpability of a juvenile who has committed a severe crime. The focus of the statutory scheme is the psychological growth and "increased maturity" of the youthful offender (§ 4801, subd. (c)), now an adult, as manifested by his or her behavior and efforts to rehabilitate himself or herself

3

during his incarceration, as against his or her presumed immaturity at the time of the offense.

Had the Legislature intended—or "contemplated," as the majority fashions it—that a youthful offender at the time of his or her sentencing (or thereafter if sentence was imposed before enactment of the statute) would have the opportunity to make a record of his or her character and the influences and circumstances of the offense in order to provide a meaningful opportunity for future parole, it surely would have said so. Instead, it provided the offender the opportunity at the time of the hearing to submit, in the form of "statements" (§ 3051, subd. (f)(2)), such information as may be available, and provided the Board the option to consider the results of psychological testing (*id.*, subd. (f)(1)). Absent more specific legislative authorization, I disagree with my colleagues that, in order to effectuate the Legislature's purpose,[2] we must now remand the case to permit the trial court to determine whether defendant "was afforded an adequate opportunity to make a record of information that will be relevant [in a future parole hearing]." (Maj. opn., *ante*, p. 28.)

Unless we find the Legislature's statutory response to *Miller*, *supra*, 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455], failed to cure the potential Eighth

---

**2** The preface to the relevant legislation declared in pertinent part: "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in People v. Caballero (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in Graham v. Florida (2010) 560 U.S. 48, and Miller v. Alabama (2012) 183 L.Ed.2d 407." (Stats. 2013, ch. 312, § 1.) Further: "It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (*Ibid*.)

Amendment problem associated with imposing an LWOP term (or its equivalent) on a juvenile offender, or that the current scheme would be absurd without providing youthful offenders with a baseline hearing (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 721 [courts will not give statutes a literal meaning if doing so leads to absurd consequences]), we should not rewrite the statute to provide for such hearings. " '[A]s this court has often recognized, the judicial role in a democratic society is fundamentally to interpret laws, not to write them. The latter power belongs primarily to the people and the political branches of government . . . .' [Citation.] It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. 'This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633.)

I have no doubt that affording youthful life prisoners the opportunity for a baseline hearing could well inure to their benefit in any future parole hearing. For that reason, we may now anticipate petitions for such hearings will be filed in numerous courts throughout California as juvenile life prisoners (and those youthful offenders who have been sentenced to the equivalent of LWOP) seek to take advantage of this court's ruling. Indeed, holding periodic update hearings to evaluate a youthful offender's progress towards parole suitability would also be beneficial. So, too, might it be for adult offenders. But this court is not authorized to create and require such procedures simply because they might be a good idea.

In short, judicial restraint counsels that we hesitate to create on our own initiative new procedural rules neither constitutionally nor legislatively required in the guise of implementing an unexpressed legislative intent. The Legislature is in the best position, as the Board begins to discharge its responsibilities under the

5

new youth offender parole hearing statutes, to consider and implement any new evidentiary procedures that experience may suggest would be necessary or desirable.

Because I believe a failure to remand and give defendant the opportunity to present evidence in a baseline hearing would not render his sentence unconstitutional under *Miller*, *supra*, 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] or the Eighth Amendment, and because I see no evidence in the statutory scheme the Legislature intended to create such procedures, I respectfully dissent from that part of the majority's decision remanding the case for a baseline hearing. The Legislature, of course, remains free to amend the pertinent statutes to specifically authorize such hearings.

**WERDEGAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Franklin

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 224 Cal.App.4th 296
**Rehearing Granted**

_____

**Opinion No.** S217699
**Date Filed:** May 26, 2016

_____

**Court:** Superior
**County:** Contra Costa
**Judge:** Leslie G. Landau

_____

**Counsel:**

Gene D. Vorobyov, under appointment by the Supreme Court, for Defendant and Appellant.

Frank C. Newman International Human Rights Law Clinic, Constance de la Vega; Sheppard, Mullin, Richter & Hampton and Neil A.F. Popović for Human Rights Advocates as Amicus Curiae on behalf of Defendant and Appellant.

Heidi L. Rummel and Kristen Bell for Post-Conviction Justice Project as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistants Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon, Laurence K. Sullivan and Juliet B. Haley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gene D. Vorobyov
Law Office of Gene Vorobyov
450 Taraval Street, #112
San Francisco, CA  94116
(415) 425-2693

Juliet B. Haley
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5960