Filed 9/22/20  P. v. Lomeli CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B297259 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA113917) |
| v. | |
| JOSE LOUIS LOMELI et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Steven D. Blades, Judge.  Affirmed with directions.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Jose Louis Lomeli.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant Juan Carlos Quinarez.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendants and appellants Jose Louis Lomeli and Juan Carlos Quinarez were convicted by jury of murder and attempted murder in a gang-related shooting. Gang and firearm use allegations were found true. The jury also found Lomeli guilty of numerous additional felonies arising from his efforts to evade arrest. Defendants were both sentenced to multiple indeterminate terms.

We agree with Lomeli that the trial court must correct its sentencing minute order to accurately reflect a second strike sentence and not a third strike sentence. However, we otherwise reject the contentions raised by both defendants and affirm their convictions in their entirety.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.    The Events of June 10 and 11, 2016**

On the evening of June 10, 2016, A.M-L. and J.E. went to a small house party to celebrate the birthday of their friend, A.L. The party was mostly attended by family members, including A.L.'s parents and his brother G.L.[1]

Sometime after midnight, in the early morning hours of June 11, A.M-L. and J.E. decided to head home. They walked across the street to where J.E.'s car was parked and got in. Before they could pull away from the curb, an SUV pulled alongside them and stopped.

G.L., who had remained in the front yard as his friends walked across the street, saw a white SUV drive down the street, make a quick U-turn and park close to J.E.'s car. A.L. had gone inside the house but ran back out when he heard tires screeching.

---

[1]    We refer to the victims and witnesses by their initials to protect their privacy.

Both G.L. and A.L. heard yelling—some sort of altercation. Concerned for their friends, they started walking toward where the cars were parked.

Three people, two wearing hoodies and one wearing a hat, got out of the SUV and asked A.M-L. and J.E. where they were from. A.M-L. understood the question as asking whether they belonged to a gang. A.M-L. said they were from nowhere. J.E. got out of the car and exchanged words with the individuals and very quickly a physical altercation erupted between J.E. and one of the individuals from the SUV. J.E. looked like he needed help so A.M-L. got out of the car. Almost immediately after confronting one of the individuals, shots rang out. A.M-L. was hit multiple times and fell to the ground, as did J.E.

G.L. saw someone fighting with J.E. and another person fighting with A.M-L. right before the shooting started. G.L. started to run in the direction of his friends, but the shooter then turned toward him. Both he and his brother saw muzzle flashes, so they turned and ran in the opposite direction to take cover.

After the SUV fled, A.L. and G.L. ran back to where J.E. and A.M-L. lay in the street. J.E. appeared dead. A.M-L. looked bad and was gasping for air. G.L. jumped into J.E.'s car and drove off, hoping to find the SUV. He was unable to find the SUV but caught the attention of a patrol car and drove back to the crime scene.

J.E. died from the gunshot wounds he received. A.M-L. received multiple nonfatal gunshot wounds, including to his right arm and shoulder, his left hip, the left side of his head and his chin.

## 2.    Testimony of Megan Anzelde

In June 2016, Megan Anzelde was dating Lomeli.  At the time, Lomeli was the leader of the Townsmen criminal street gang with the nickname Villain.  She knew Quinarez by his gang moniker, Loco.  Lomeli was known for always carrying a loaded nine-millimeter handgun.  Ms. Anzelde saw Lomeli habitually carry it openly in front of Quinarez.

On the night of June 10, 2016, Ms. Anzelde was with Lomeli, Quinarez and two other Townsmen gang members, Jesse Nunez, known as Crooks, and the other known as Dreamer.  They were at Dreamer's house drinking, doing drugs (methamphetamine) and hanging out.  At some point, Lomeli said that the younger gang members (including Quinarez and Nunez) needed some "schooling" and needed to be shown what "old school gang banging was about."  He was holding his handgun at the time.

Sometime after midnight, Ms. Anzelde, Lomeli, Quinarez and Nunez left Dreamer's house in a white SUV driven by Ms. Anzelde.  Lomeli was in the front passenger seat and Nunez and Quinarez were seated behind them.

Ms. Anzelde heard either Quinarez or Nunez say that someone was "hitting up" a wall, meaning someone was writing graffiti.  They were in Townsmen territory.  Lomeli told Ms. Anzelde to make a U-turn, turn off her headlights and go back.  She complied.

Ms. Anzelde saw two males (whom she did not recognize) "jogging" across the street toward a parked car.  She stopped the SUV next to the car, but kept the engine running.  Lomeli, Quinarez and Nunez got out.  Lomeli asked the two men where they were from.  One of them replied they were from nowhere.

Lomeli then said, "Townsmen" and the man standing next to the driver's side of the car (J.E.) replied "Fuck Townsmen." A fistfight erupted. Ms. Anzelde did not see who threw the first punch. Everything happened very fast. All five men were moving around in close quarters, but her attention was on Lomeli. At some point, Lomeli hit J.E. in the head with the butt of his handgun, and he fell down. The other man (A.M-L.) then started wrestling with Lomeli in an apparent attempt to wrest the gun from him. Lomeli shot A.M-L. and then shot J.E. as he started to get up from the ground. Lomeli fired multiple shots, possibly around 10.

Neither Quinarez nor Nunez returned to the SUV. They ran down the street in the direction of Quinarez's house. Ms. Anzelde and Lomeli later learned Quinarez had been shot in the shoulder during the fight and went to a hospital in West Covina for treatment.

Lomeli got back into the SUV. His hands and clothes had blood on them. He told Ms. Anzelde to drive and then immediately told her to stop. He said he forgot his hat and jumped out to look for it. Lomeli had been wearing a hat with the letter "T" on it signifying the Townsmen gang. Ms. Anzelde heard a few more gunshots and then Lomeli returned to the SUV with a hat in his hand. He told her to drive to his grandmother's house but then realized he had the wrong hat and told Ms. Anzelde to turn around and go back to the crime scene. She refused because she was too scared and kept driving to Lomeli's grandmother's house. The hat was later found at the crime scene.

The next day, Ms. Anzelde and Lomeli cleaned the blood spatter from the exterior and interior of the SUV, borrowed some

money from a friend and fled to Arizona. Before they left, Lomeli reloaded his handgun. They stayed with one of Lomeli's friends in Arizona for a few weeks, and while they were there, Lomeli sold the handgun. Lomeli and Ms. Anzelde drove back to California a short time later, returning to the home of Lomeli's grandmother.

Ms. Anzelde said that after they returned to California, Lomeli took the SUV one day, evaded police and eventually abandoned it on the road. Shortly thereafter, with Ms. Anzelde in tow, Lomeli stole a jeep in Claremont and led police on a high speed chase. Eventually, he crashed the jeep and fled. Ms. Anzelde was taken into custody. She spoke with police and told them about the shooting incident in June and that Lomeli and Quinarez were involved. She warned the police that Lomeli did not want to be arrested or return to prison and that he was carrying a .45-caliber handgun he had obtained from his uncle.

### 3. Additional Evidence

An autopsy revealed J.E. suffered multiple gunshot wounds, including a fatal shot to his head. He also had a laceration on his scalp consistent with blunt force trauma.

Detective Karen Shonka and her partner, Wayne Holston, testified about the investigation. Less than a week after the shootings, they interviewed A.M-L. after he was released from the hospital. The audio recording of the interview was played for the jury. During the interview, A.M-L. explained how the SUV pulled up next to them and caught them by surprise. He said everything happened very fast and that after the fistfight erupted when J.E. got out of the car, he saw one of the other guys "going towards" J.E. That was when he decided to get out of the car and

6

try to help J.E.  A.M-L. "started fighting with them" and almost immediately he was shot.

Detective Shonka testified that A.M-L. made a circle or something like a sideways "V" with his fingers in describing how the two other individuals from the SUV closed ranks behind the person fighting with J.E.

The detectives received information from another law enforcement entity working an unrelated case in which a wiretap had been authorized on a gang member known as Shyboy.  They intercepted a phone call between Lomeli and Shyboy on June 11, 2016.  An audio recording of the phone call was provided to the detectives.  In the recording, Lomeli makes numerous references to the shootings, including referring to the victims as dogs, saying "Loco" and "Crooks" were there, expressing anxiety about having been sweaty and leaving his hat behind, and needing to get out of town.

Excerpts of the call were played for the jury.  Ms. Anzelde identified her voice and that of Lomeli on the recording and explained that the call occurred while she and Lomeli were driving to Arizona.

Numerous nine-millimeter shell casings were found at the scene.  Testing revealed that samples taken from the hat with the "T" logo found at the crime scene were consistent with Lomeli's DNA profile.

Detective Armando Orellana testified as the prosecution's gang expert.  He stated his opinion that Lomeli and Quinarez were members of the Townsmen gang, as was Jesse Nunez.  He described the gang's signs and use of the Texas Rangers "T" logo, and said the shooting occurred in territory claimed by the Townsmen gang.  He also testified about gang culture generally,

including that gang members engage in crimes together to back each other up and to strengthen the reputation of the gang.

Testimony was received, including from officers with the Claremont and West Covina Police Departments, about the two different high speed pursuits involving Lomeli that eventually resulted in his arrest in August 2016.

### 4. The Charges and Motion to Consolidate

Lomeli and Quinarez were charged with one count of murder (Pen. Code, § 187, subd. (a); count 1), and three counts of attempted murder (§§ 187, subd. (a), 664; counts 2-4). Lomeli was also charged with one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 5) and with having suffered a prior strike within the meaning of the "Three Strikes" law. Gang and firearm use allegations were also pled (§§ 186.22, 12022.53, subds. (b)-(e)(1)).

Ms. Anzelde was originally charged as a codefendant. She subsequently agreed to plead guilty and testify against Lomeli and Quinarez pursuant to a leniency agreement. According to the terms of her agreement, if she testified truthfully against her codefendants, she would receive a sentence of seven years.

Prior to trial, the court granted the prosecution's request to consolidate the 10 additional charges against Lomeli arising from his efforts to evade arrest on August 24 and August 28, 2016: two counts of fleeing a police vehicle and driving against traffic (Veh. Code, § 2800.4; counts 7 & 10), two counts of taking a vehicle without consent (Veh. Code, § 10851; Pen. Code, § 666.5; counts 8 & 15), one misdemeanor count of resisting or obstructing a peace officer (Pen. Code, § 148, subd. (a); count 9), one count of fleeing a police vehicle recklessly (Veh. Code, § 2800.2; count 11), one count of carrying a loaded firearm with a prior (Pen. Code,

8

§ 25850, subd. (a); count 12), one count of being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1); count 13), one count of being in unlawful possession of ammunition (Pen. Code, § 30305, subd. (a)(1); count 14), and one count of resisting an executive officer (Pen. Code, § 69; count 16). (There was no count 6.)

The case proceeded to a joint jury trial in September 2018.

## 5. The Verdict and Sentencing

The jury found Lomeli guilty on all counts and found true all of the gang and firearm use allegations. The jury found Quinarez guilty of murder (count 1) and the attempted murder of A.M-L. (count 2), and found true the gang and firearm use allegations as to those two counts. The jury acquitted Quinarez of the attempted murders of A.L. and G.L.

At the bifurcated bench trial, Lomeli admitted he suffered a conviction for assault in 2009 that qualified as a strike under the Three Strikes law and as a serious felony for purposes of Penal Code section 667, subdivision (a)(1). Counsel joined in and stipulated to a factual basis for the admission.

The court sentenced Lomeli to six consecutive life terms with a minimum sentence of 160 years, plus an aggregate determinate term of 23 years eight months. The court imposed various fines and fees and awarded defendant 1,096 actual days of presentence custody credits.

The court sentenced Quinarez to four consecutive life terms with a minimum sentence of 82 years. The court imposed various fines and fees and awarded defendant 970 actual days of presentence custody credits. Before sentencing Quinarez, the court accepted his evidentiary submissions pursuant to Penal Code section 3051, including a report from Dr. Nancy Kaiser-

9

Boyd. The prosecution requested that the record reflect Quinarez had gotten additional gang-related tattoos while in custody.

This appeal followed.

**DISCUSSION**

**1.    Defendant Lomeli**

It is undisputed Lomeli was duly advised and voluntarily waived his constitutional jury trial rights before admitting his prior conviction. The only claim of error Lomeli asserts on appeal is the court committed prejudicial error by failing to advise him of the penal consequences of admitting his prior conviction. The contention has been forfeited because Lomeli, who was represented by counsel at all relevant times, did not object on these grounds in the trial court.

"[U]nlike the admonition required for a waiver of constitutional rights, advisement of the penal consequences of admitting a prior conviction is not constitutionally mandated. Rather, it is a judicially declared rule of criminal procedure. [Citations.] Consequently, *when the only error is a failure to advise of the penal consequences, the error is waived if not raised at or before sentencing*. [Citation.] Such policies ensure the fair and orderly administration of justice." (*People v. Wrice* (1995) 38 Cal.App.4th 767, 770-771, italics added; see also *In re Yurko* (1974) 10 Cal.3d 857, 864 [requirement to advise of penal consequences of prior convictions is "judicially declared rule of criminal procedure"].) The purpose underlying the doctrines of waiver and forfeiture is to encourage defendants to raise objections and bring errors to the attention of the trial court so that they may be timely corrected or avoided altogether. (*Ibid*.)

The contention is not only waived, but there is nothing in the record to suggest Lomeli was prejudiced. (*In re Yurko, supra,*

10 Cal.3d at p. 864 [the failure to advise a defendant of penal consequences of plea is error and "if prejudice appears" requires the setting aside of finding as to truth of prior conviction]; *People v. Karis* (1988) 46 Cal.3d 612, 650 [same].)  Nothing in the record suggests that if the court had admonished Lomeli about the penal consequences of the prior strike, he would have chosen to proceed to a bench trial on the prior conviction, or that the prosecution could not prove the prior conviction beyond a reasonable doubt.

Lomeli argues in the alternative that if we do not reverse and remand for a new sentencing hearing, then we should order the superior court to correct its minutes which erroneously refer to the case as a "Third Strike case" instead of a "Second Strike case."  Respondent concedes the minute order should be corrected.

We agree the sentencing minute order must be corrected and order the superior court to make the necessary corrections to its minutes.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [courts have inherent power to correct clerical errors to make records reflect true facts].)

## 2.    **Defendant Quinarez**

Quinarez contests the adequacy of the evidence supporting his convictions as an aider and abettor in the murder of J.E. and the attempted murder of A.M-L.  "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "The standard of review is the same in cases in

11

which the prosecution relies mainly on circumstantial evidence." (*Ibid.*) The record contains ample evidence of Quinarez's guilt.

To be held liable as an aider and abettor, one need not personally participate in the elements of the crime. (*People v. Morante* (1999) 20 Cal.4th 403, 433.) It is sufficient if, knowing of the direct perpetrator's unlawful intent, one assists or encourages the commission of the crime. (*Ibid.*) " 'Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 58.) Presence at the scene, companionship, and conduct before and after the offense are relevant factors in resolving the question of aiding and abetting liability. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [presence near direct perpetrator in order to intimidate victim, divert suspicion or watch out for others "is a textbook example of aiding and abetting"].)

The testimony of G.L., A.L., Ms. Anzelde, Detective Shonka, A.M-L. and the gang expert was more than enough to support a reasonable inference that Quinarez was directly assisting Lomeli in his attack on, and the eventual shooting of, the two victims. His presence before the crimes and his conduct at the scene in backing up Lomeli and fighting with A.M-L. was sufficient evidence upon which the jury could reasonably rest its verdict.

Quinarez next contends the trial court erred in consolidating for trial the additional charges against Lomeli stemming from his efforts to evade arrest. He argues the jury was unduly influenced into convicting him on the murder and attempted murder charges based on his association with Lomeli,

12

the older gang member who had engaged in numerous violent offenses.  We are not persuaded.

Plainly a joint trial of defendants on the murder count and the three counts of attempted murder was proper.  (Pen. Code, § 1098 ["When two or more defendants are jointly charged with any public offense . . . , they must be tried jointly, unless the court order separate trials"].)  The court's order consolidating the additional charges against Lomeli did not render the joint trial fundamentally unfair or otherwise result in undue prejudice to Quinarez.

Most of the testimony at trial came from A.M-L., Detective Shonka, G.L., A.L., Ms. Anzelde and the prosecution's gang expert describing the unprovoked gang attack on J.E. and A.M-L. The additional, relatively brief testimony regarding Lomeli's flight and efforts to twice evade police capture was not more inflammatory or of such a quality as to improperly influence the jury into convicting Quinarez because of Lomeli's additional misdeeds.

Indeed, the jury acquitted Quinarez of the attempted murder charges in counts 3 and 4 (the shooting at A.L. and G.L.). The jury's ability to differentiate between the defendants and the charges reflects careful, discriminating deliberations.  (See, e.g., *People v. Gomez* (2018) 6 Cal.5th 243, 277-278 [jury's findings of guilt on one charge and the inability to reach a verdict on another suggested it " ' was capable of, and did, differentiate among ' " and was not unduly influenced by joinder]; *People v. Mackey* (2015) 233 Cal.App.4th 32, 105 [same].)

Quinarez also contends the trial court had a sua sponte duty to instruct on manslaughter because the evidence supported a finding the shooting was the result of heat of passion.  We

13

independently review whether a trial court erroneously failed to instruct on a lesser included offense.  (*People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*).)  We find no such error.

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.'  ([Pen. Code,] § 187, subd. (a).)  'Manslaughter is the unlawful killing of a human being without malice.'  (§ 192, subd. (a).)  Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter.  Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter."  (*Nelson*, *supra*, 1 Cal.5th at p. 538.)

The trial court's obligation to instruct on all principles of law relevant to the issues raised by the evidence at trial includes the obligation to instruct on any lesser included offenses.  (*People v. Smith* (2013) 57 Cal.4th 232, 239.)  However, *no duty to instruct arises unless there is substantial evidence* to support a jury finding on the lesser offense.  A lesser included instruction is warranted " 'only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' " (*Nelson*, *supra*, 1 Cal.5th at p. 538.)

During the parties' discussion of jury instructions with the court, the court said it did not see any evidence of voluntary manslaughter and specifically asked defense counsel if he was requesting such an instruction.  Defense counsel said he was not. That is not surprising given the evidence discussed above, and because Quinarez's theory of the case was that he did not do anything to aid and abet Lomeli, whether he acted with

14

premeditation or under heat of passion. "Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709.)

Here, there is no credible evidence suggesting any objectively reasonable provocation to support a manslaughter instruction. For manslaughter to come into play, "the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citation.] The standard is not the reaction of a 'reasonable gang member.'" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) The Supreme Court has consistently rejected arguments that "insults or gang-related challenges" are sufficient provocation to warrant instruction on voluntary manslaughter. (*Ibid*.)

Quinarez argues that J.E.'s retort of "Fuck Townsmen" was more than a gang taunt and was the equivalent of saying "Fuck you." Whether it was a gang taunt or a personal insult, hearing "Fuck you" would not cause an ordinary person to fly into a homicidal rage. There was no duty to give a manslaughter instruction.

Finally, Quinarez argues the trial court should have considered his age as a mitigating factor at sentencing and the failure to do so resulted in a denial of due process, equal protection and a lengthy sentence that violates the Eighth Amendment's proscription against cruel and unusual punishment. We are not persuaded.

Quinarez did not raise any objection on this ground in the trial court and has therefore forfeited the contention. (See, e.g., *People v. Baker* (2018) 20 Cal.App.5th 711, 720.)

15

In any event, the contention is without merit.  Quinarez was almost 19 years old, an adult at the time he committed these despicable crimes.  As our Supreme Court has explained, " '[d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules.  The qualities that distinguish juveniles from adults do not disappear when an individual turns 18.  By the same token, some under 18 have already attained a level of maturity some adults will never reach.' (*Roper* [*v. Simmons* (2005) 543 U.S. 551,] 574.)  But '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood' (*ibid*.), and that is the line the high court has drawn in its Eighth Amendment jurisprudence." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380.)  Quinarez has not demonstrated his sentence violates the Eighth Amendment proscription against cruel and unusual punishment.

Quinarez was not denied due process.  The trial court provided defendant time to submit evidence in accordance with Penal Code section 3051 which provides a mechanism for early parole eligibility for youthful offenders.  As relevant here, section 3051, subdivision (b)(3) provides that "[a] person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration."

Quinarez will have "a meaningful opportunity for release" no more than 25 years into his term of incarceration.  (*People v. Franklin* (2016) 63 Cal.4th 261, 277.)

## DISPOSITION

The trial court is ordered to correct its sentencing minute order as to defendant and appellant Jose Louis Lomeli to accurately reference a second strike case and not a third strike case. The judgment of conviction as to Jose Louis Lomeli is affirmed in all other respects.

The judgment of conviction as to defendant and appellant Juan Carlos Quinarez is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

WILEY, J.

17