Filed 5/16/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COMMISSION ON STATE MANDATES,<br><br>    Defendant and Respondent;<br><br>DEPARTMENT OF FINANCE et al.,<br><br>    Real Parties in Interest and Respondents. | D079742<br><br>(Super. Ct. No. 37-2020-00009631-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge. Affirmed.

Office of County Counsel, Thomas Deak, and Walter de Lorrell III; Best Best & Krieger, Rebecca Andrews, and Weiland Chiang for Plaintiff and Appellant.

Juliana F. Gmur, Senior Commission Counsel, and Camille Shelton, Chief Legal Counsel, for Defendant and Respondent.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, Benjamin M. Glickman and Seth E. Goldstein, Deputy Attorneys General, for Real Parties in Interest and Respondents.

I

INTRODUCTION

Section 6 of Article XIII B of the California Constitution generally requires the State to reimburse local governments when the Legislature imposes a mandate on the local governments to carry out new programs or higher levels of service.  Relying on this constitutional provision, the County of San Diego filed a test claim with the Commission on State Mandates seeking reimbursement from the State for costs the County incurs to prepare for, and attend, criminal proceedings known as *Franklin* proceedings.[1] Broadly speaking, *Franklin* proceedings afford youth offenders serving lengthy prison sentences an opportunity to introduce evidence of youth-related factors that may be relevant when the youth offenders become eligible for parole many years in the future.

The Commission denied the County's test claim.  It found the costs at issue were not reimbursable because the laws on which the County based its test claim—Penal Code sections 3041, 3046, 3051, and 4801, as added and amended by Statutes 2013, chapter 312, Statutes 2015, chapter 471, and Statutes 2017, chapter 684 (collectively, the Test Claim Statutes)—do not expressly require counties to participate in *Franklin* proceedings. Alternatively, the Commission found the County was not entitled to reimbursement because the Test Claim Statutes fell within an exception to the mandatory reimbursement requirement, which applies when a law

_____

[1]     *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

2

changes the penalty for a crime. (Gov. Code, § 17556, subd. (g).) The County sought judicial review, but the trial court denied relief for the same reasons articulated by the Commission in its decision denying the test claim.

Like the Commission and the trial court, we conclude the County is not entitled to mandatory reimbursement from the State because the Test Claim Statutes—the laws giving rise to the County's reimbursement claim—change the penalties for crimes. In our view, these laws change the penalties for crimes because they make the vast majority of youth offenders in the State eligible to receive a youth offender parole hearing and, as a result, many youth offenders are released from prison years or even decades earlier than they would have been if they had served out their original sentences. Given our determination that the Test Claim Statutes change the penalties for crimes, and thus fall within the statutory exception to the mandatory reimbursement requirement, it is unnecessary for us to decide whether the Test Claim Statutes impose a mandate on counties to carry out a new program or a higher level of service.

The judgment is affirmed.

## II

## BACKGROUND

1. *Constitutional Subvention Provisions*

In 1978, voters in our State approved an initiative measure adding Article XIII A to the California Constitution. (Prop. 13, as approved by voters, Primary Elec. (June 6, 1978).) The measure "imposes a limit on the power of state and local governments to adopt and levy taxes." (*County of Fresno v. State of Cal.* (1991) 53 Cal.3d 482, 486 (*Fresno*); see *Dept. of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727, 735 (*Kern*)

3

["Article XIII A (adopted by the voters in 1978 as Proposition 13), limits the *taxing* authority of state and local government."].)

The following year, California voters approved an initiative measure adding Article XIII B to the California Constitution. (Prop. 4, as approved by voters, Special Statewide Elec. (Nov. 6, 1979).) This measure "place[d] limitations on the ability of both state and local governments to appropriate funds for expenditures." (*Fresno, supra*, 53 Cal.3d at p. 486; see *Kern, supra*, 30 Cal.4th at p. 735 ["Article XIII B (adopted by the voters in 1979 as Proposition 4) limits the *spending* authority of state and local government."].) Article XIII A and Article XIII B " 'work in tandem, together restricting California governments' power both to levy and to spend for public purposes.' " (*County of San Diego v. State of Cal.* (1997) 15 Cal.4th 68, 81 (*San Diego*).) "Their goals are 'to protect residents from excessive taxation and government spending.' " (*Ibid.*)

Section 6 of Article XIII B (hereafter, section 6) is the constitutional provision of relevance to the current proceeding. As a general matter, and subject to specified exceptions, section 6 provides, "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service."[2] (Cal. Const., art. XIII B, § 6, subd. (a).) Section 6 "preclude[s] the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*San Diego, supra*, 15 Cal.4th at p. 81.)

---

[2]    " 'Subvention' generally means a grant of financial aid or assistance, or a subsidy." (*Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577.)

4

" 'Essentially, the constitutional rule of state subvention provides that the state is required to pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies. [Citation.] This does not mean that the state is required to reimburse local agencies for any incidental cost that may result from the enactment of a state law; rather, the subvention requirement is restricted to governmental services which the local agency is required by state law to provide to its residents. [Citation.] The subvention requirement is intended to prevent the state from transferring the costs of government from itself to local agencies. [Citation.] Reimbursement is required when the state "freely chooses to impose on local agencies *any* peculiarly 'governmental' cost which they were not previously required to absorb." ' " (*County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 906–907.)

As noted, section 6 enumerates a handful of exceptions to its rule requiring reimbursement for legislative mandates. It permits, but does not require, reimbursement "for the following mandates: [¶] (1) Legislative mandates requested by the local agency affected. [¶] (2) *Legislation defining a new crime or changing an existing definition of a crime*. [¶] (3) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975. [¶] (4) Legislative mandates contained in statutes within the scope of paragraph (7) of subdivision (b) of Section 3 of Article I [of the California Constitution]." (Cal. Const., art. XIII B, § 6, subd. (a), italics added.) Thus, the State is not required to reimburse local governments when a legislative mandate defines a new crime or changes the definition of a crime, among other circumstances.

5

2. *Statutory Subvention Framework*

"In 1984, the Legislature created a statutory procedure for determining whether a statute imposes state-mandated costs on a local agency within the meaning of section 6. (Gov. Code, § 17500 et seq.)" (*San Diego, supra*, 15 Cal.4th at p. 81.) The statutory scheme generally compels the State to "reimburse each local agency and school district for all 'costs mandated by the state,' " (Gov. Code, § 17561, subd. (a)), and it defines "[c]osts mandated by the state," as "any increased costs which a local agency or school district is required to incur … as a result of any statute … which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIIIB of the California Constitution," (*id.*, § 17514).

One provision contained within the statutory scheme, Government Code section 17556, "outlines six circumstances where duties imposed by statute on local governments are not deemed 'costs mandated by the state.' " (*County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 207.) One such circumstance exists when a "statute create[s] a new crime or infraction, eliminate[s] a crime or infraction, or change[s] the penalty for a crime or infraction, but only for that portion of the statute relating directly to the enforcement of the crime or infraction." (Gov. Code, § 17556, subd. (g).)

The Commission is "charged with the responsibility of hearing and deciding, subject to judicial review by an administrative writ of mandate, claims for reimbursement made by local governments or school districts. (Gov. Code, § 17551.)" (*San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859, 872 (*SDUSD*).) An initial reimbursement claim filed by a local government or school district is known as a test claim. (Gov. Code, § 17521.) "The test claim process allows the claimant and other interested parties to present written evidence and

6

testimony at a public hearing.  [Citations.]  Based on that evidence, the Commission must decide whether the challenged statute or executive order mandates a new program or increased level of service." (*Coast Community College Dist. v. Commission on State Mandates* (2022) 13 Cal.5th 800, 808 (*CCCD*).)  "The Commission's adjudication of the test claim 'governs all subsequent claims based on the same statute.' " (*Department of Finance v. Commission on State Mandates* (2021) 59 Cal.App.5th 546, 553, fn. 4; see also *SDUSD,* at p. 872, fn. 10 ["a 'test claim is like a class action—the Commission's decision applies to all [local governments and] school districts in the state' "].)

"In making [its] determination, the Commission is required to address a series of questions.  First, it must decide whether the legal provision for which subvention is sought compels the local agency to act or merely invites voluntary action.  If the provision compels action, the Commission must next decide whether the compelled activity requires the agency to provide 'a new program or higher level of service.'  [Citation.]  Finally, if the Commission finds a statute or executive action mandates a new program or higher level of service, it must consider if any of the enumerated exceptions to reimbursement apply." (*CCCD, supra,* 13 Cal.5th at p. 808.)

For purposes of section 6, a "program" refers to:  (1) a program that carries out the governmental function of providing services to the public; or (2) a law which, to implement state policy, imposes unique requirements on local governments and does not apply generally to all residents and entities in the state.  (*SDUSD, supra,* 33 Cal.4th at p. 874.)  A "higher level of service" refers to " 'state mandated increases in the services provided by local agencies in existing 'programs.' " (*Ibid.*)  "[S]imply because a state law or order may *increase the costs* borne by local government *in providing services*,

7

this does not necessarily establish that the law or order constitutes an *increased or higher level* of the resulting 'service to the public' under article XIII B, section 6, and Government Code section 17514." (*Id.* at p. 877.)

    3. *Eighth Amendment Jurisprudence*

Beginning in the mid-2000's, the U.S. Supreme Court and the California Supreme Court issued a series of bedrock decisions collectively standing for the proposition that the Cruel and Unusual Punishment Clause of the Eighth Amendment prohibits the imposition of certain of our nation's most severe penalties on juvenile offenders, without at least some consideration being given to the distinctive characteristics of youth that render juvenile offenders less culpable, as a class, than adult offenders.[3]

The first of these decisions was *Roper v. Simmons* (2005) 543 U.S. 551, in which the U.S. Supreme Court proscribed the death penalty for defendants who committed their crimes when they were older than 15 but younger than 18.[4] In prohibiting the death penalty for such defendants, the *Roper* court recognized three differences between juveniles and adults, which precluded juveniles from being "classified among the worst offenders." (*Id.* at p. 569.) First, " '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." (*Ibid.*) Second, "juveniles are more

---

[3]    The Cruel and Unusual Punishment Clause of the Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)

[4]    A plurality of the U.S. Supreme Court previously held that the Cruel and Unusual Punishment Clause of the Eighth Amendment forbids the death sentence for any defendant who was under the age of 16 at the time of his or her offense. (*Thompson v. Oklahoma* (1988) 487 U.S. 815.)

vulnerable or susceptible to negative influences and outside pressures, including peer pressure." (*Ibid.*) And third, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." (*Id.* at p. 570.) Given these differences, the *Roper* court concluded the penological goals of the death penalty—retribution and deterrence—applied with lesser force to juvenile offenders compared to adult offenders. (*Id.* at pp. 571–572.) In the words of the *Roper* court, the differences between adults and juveniles are simply "too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." (*Id.* at pp. 572–573.)

A few years later, the U.S. Supreme Court issued *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), which prohibited sentences of life in prison without the possibility of parole (LWOP) for juveniles convicted of nonhomicide crimes. Like the *Roper* court, the *Graham* court reiterated that "juveniles have lessened culpability" and, therefore, "they are less deserving of the most severe punishments." (*Graham*, at p. 68.) The *Graham* court also opined on the seriousness of an LWOP sentence, describing it as " 'the second most severe penalty permitted by law.' " (*Id.* at p. 69.) It "deprives the convict of the most basic liberties without giving hope of restoration." (*Id.* at pp. 69–70.) Further, an LWOP sentence is "an especially harsh punishment for a juvenile," since a juvenile offender "will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Id.* at p. 70.) Given the distinctive characteristics of youth, as well as the severity of LWOP, the court concluded the penological justifications for LWOP were insufficient for Eighth Amendment purposes in cases involving juvenile perpetrators of nonhomicide crimes. (*Id.* at pp. 71–75.) The court clarified that a state need not "guarantee eventual freedom to a juvenile offender

9

convicted of a nonhomicide crime." (*Id.* at p. 75.) But it must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance." (*Ibid.*)

Not long after the U.S. Supreme Court issued the *Graham* decision, it determined that *mandatory* LWOP sentences for juvenile offenders also run afoul of the Cruel and Unusual Punishments Clause, even when the offenders have perpetrated homicide crimes. (*Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*).) As the *Miller* court explained, mandatory LWOP penalty schemes "prevent the sentencer from taking account of [the] central considerations" of youth. (*Id.* at p. 474.) "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult— these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." (*Ibid.*) According to *Miller,* "[t]hat contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Ibid.*)

Finally, in *People v. Caballero* (2012) 55 Cal.4th 262, the California Supreme Court extended the reasoning of *Graham* to cases where a juvenile convicted of a nonhomicide crime is sentenced to prison for a term of years that is equivalent to an LWOP sentence. The *Caballero* court reasoned, "Consistent with the high court's holding in *Graham*, … sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive

10

them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Id.* at p. 268.)

    4. *Youth Offender Parole Hearings*

In response to these watershed Eighth Amendment decisions, the California Legislature enacted Senate Bill No. 260 (2013–2014 Reg. Sess.), which added Penal Code section 3051 and amended Penal Code sections 3041, 3046, and 4801, effective January 1, 2014. Section 1 of the bill states, "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.Ed.2d 407. … It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Stats. 2013, ch. 312, § 1.)

As originally enacted, Penal Code section 3051 required the Board of Parole Hearings (hereafter, the Board), a state agency, to conduct parole hearings known as youth offender parole hearings for most juvenile offenders who were under the age of 18 when they committed their controlling offenses.[5] (Former Pen. Code, § 3051, subds. (b), (d), added by Stats. 2013, ch. 312, § 4.) The law required the Board to hold a youth offender parole hearing during a juvenile offender's 15th year of incarceration in cases where the offender was sentenced to a determinate sentence, during a juvenile

---

[5] " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (Pen. Code, § 3051, subd. (a)(2)(B).)

offender's 20th year of incarceration in cases where the offender was sentenced to a life term of less than 25 years to life, and during a juvenile offender's 25th year of incarceration in cases where the offender was sentenced to 25 years to life. (*Id.*, subd. (b)(1)–(3).)

In addition to enacting Penal Code section 3051, the bill amended Penal Code section 4801. (Stats. 2013, ch. 312, § 5.) As amended, Penal Code section 4801 requires the Board, at a youth offender parole hearing, to "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (Pen. Code, § 4801, subd. (c).) Penal Code section 3051, in turn, states in part: "(f)(1) In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of youth as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual. [¶] (2) Family members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime or the individual's growth and maturity since the time of the crime may submit statements for review by the board." (Pen. Code, § 3051, subd. (f)(1), (2).)

"In 2015, the Legislature expanded [Penal Code] section 3051 to apply to offenders who committed crimes at the age of 23 or younger. (Former [Pen. Code,] § 3051, subd. (a)(1), added by Stats. 2015, ch. 471, § 1.) The amendment's author cited '[r]ecent scientific evidence on adolescent and young adult development and neuroscience show[ing] that certain areas of the brain—particularly those affecting judgment and decision-making—do

12

not fully develop until the early-to mid-20s.' (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261 (2015–2016 Reg. Sess.) Apr. 28, 2015, p. 3.)" (*People v. Acosta* (2021) 60 Cal.App.5th 769, 776–777.)

Then, in 2017, the Legislature further amended Penal Code section 3051 to apply "to offenders who committed the controlling offense when 25 years old or younger [citation]. In addition, in the 2017 legislation raising the threshold age to 25, the Legislature extended youth parole hearings in the 25th year of incarceration to juveniles sentenced to life without the possibility of parole for a controlling offense committed before the age of 18." (*People v. Hardin* (2022) 84 Cal.App.5th 273, 282; Stats. 2017, ch. 684, § 1.5.)

Thus, under current law, and subject to exceptions, " 'an offender who committed a "controlling offense" under the age of 26 is entitled to a "youth offender parole hearing" during his or her 15th year of incarceration if he [or she] received a determinate sentence; during his or her 20th year of incarceration if he or she received a life term of less than 25 years to life; and during his or her 25th year of incarceration if he or she received a term of 25 years to life. [Citation.] An offender convicted of a controlling offense committed before the age of 18 for which he or she was sentenced to LWOP is entitled to a youth offender parole hearing during his or her 25th year of incarceration.' " (*People v. Jackson* (2021) 61 Cal.App.5th 189, 194.)[6]

---

6    A youth offender parole hearing is not required for certain categories of youth offenders, including youth offenders who are convicted under the Three Strikes law or the One Strike law (for certain sex offenses), or youth offenders who are sentenced to LWOP for controlling offenses that are committed after they turn 18 years old. (Pen. Code, § 3051, subd. (h).)

5. *Franklin Proceedings*

Soon after the Legislature enacted Senate Bill No. 260, our Supreme Court decided *Franklin, supra*, 63 Cal.4th 261, a seminal case addressing the interplay between the State's youth offender parole hearing system and juvenile offenders' claims of constitutional error under *Miller*.

In *Franklin*, the defendant was sentenced to a mandatory term of 50 years to life for a murder he committed at the age of 16. (*Franklin, supra*, 63 Cal.4th at pp. 269–272.) On appeal, he argued his sentence was the functional equivalent of a mandatory LWOP sentence, which he claimed was unconstitutional under *Miller*. (*Franklin,* at pp. 272–273.) The *Franklin* court determined that the rationale of *Miller* extended to cases in which a juvenile offender is subject to a mandatory sentence equivalent to LWOP. (*Franklin,* at p. 276.) Nonetheless, it concluded that the defendant's constitutional claim was mooted by Senate Bill No. 260, which the Legislature passed while the appeal was pending. (*Id.* at pp. 276–280.) The court reasoned the new law "superseded [the defendant's] sentence so that notwithstanding his original term of 50 years to life, he [was] eligible for a 'youth offender parole hearing' during the 25th year of his sentence." (*Id.* at p. 277.) And, at the youth offender parole hearing, the Board was required by statute to give great weight to the diminished culpability of youth, the hallmark features of youth, and the defendant's growth and increased maturity. (*Ibid.*) According to the court, the defendant was therefore "serving a life sentence that include[d] a meaningful opportunity for release during his 25th year of incarceration," not a sentence of LWOP or its functional equivalent. (*Id.* at pp. 279–280.)

Despite reaching this conclusion, the court determined the defendant raised "colorable concerns" that the record in his case may be incomplete or

lacking mitigation information, which could in turn deprive him of a meaningful opportunity for release at his eventual youth offender parole hearing. (*Franklin, supra*, 63 Cal.4th at pp. 268–269, 282.) It observed that the youth offender parole system "contemplate[s] that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration," including statements from family members, friends, school personnel, faith leaders, and representatives from community-based organizations. (*Id.* at pp. 283–284; see Pen. Code, § 3051, subd. (f)(2).) But "[a]ssembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Franklin*, at pp. 283–284.) Further, any psychological evaluations and risk assessment instruments used by the Board at a youth offender parole hearing must "take into consideration ... any subsequent growth and increased maturity" of the defendant (Pen. Code, § 3051, subd. (f)(1))—a statutory dictate that "implies the availability of information about the offender when he was a juvenile." (*Franklin*, at p. 284.)

Because it was unclear whether the defendant had an adequate opportunity to put this type of information on the record at sentencing, the *Franklin* court remanded the matter for the trial court to decide whether he had such an opportunity and, if he did not, to receive submissions from the parties and testimony, if appropriate. (*Franklin, supra*, 63 Cal.4th at p. 284.) The *Franklin* court determined that the defendant may, at the proceeding, "place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender

15

parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*Ibid.*)  According to the *Franklin* court, the goal of such a proceeding is "to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation] in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [citation]."  (*Ibid.*) These proceedings are commonly known as *Franklin* proceedings.[7]

Three years later, the Supreme Court issued *Cook, supra,* 7 Cal.5th 439, which held that an otherwise-eligible youth offender is entitled to a *Franklin* proceeding, even when the youth offender's judgment is already final.  As the court explained, the text of the Test Claim Statutes " 'makes clear that the Legislature intended youth offender parole hearings to apply retrospectively, that is, to all eligible youth offenders regardless of the date of conviction.' [Citation.]  By a parity of reasoning, an evidence preservation process should apply to all youthful offenders now eligible for such a parole hearing."  (*Id.* at p. 450, italics omitted.)  Further, the *Cook* court opined that the risks *Franklin* proceedings are intended to mitigate—namely, the loss or destruction of evidence bearing on youth-related factors—are present regardless of the finality of the youth offender's judgment.  (*Ibid.*)

---

[7]     A judicial officer presides over a *Franklin* proceeding and regulates its conduct, but "is not called upon to make findings of fact or render any final determination at the proceeding's conclusion."  (*In re Cook* (2019) 7 Cal.5th 439, 449, fn. 3 (*Cook*).)

6. *Procedural Background*

In 2018, the County filed a test claim with the Commission seeking reimbursement from the State for costs incurred by the County when its district attorneys and public defenders prepare for, and attend, *Franklin* proceedings. The County also sought reimbursement for costs it incurs to transport and house youth offenders for *Franklin* proceedings. The crux of the County's argument was that the Test Claim Statutes mandate a new program or higher level of service in the form of *Franklin* proceedings and, therefore, the costs incurred by the County in connection with *Franklin* proceedings are reimbursable under section 6. The County estimated *Franklin* proceedings require counties statewide to incur collective costs totaling between $2,750,000 and $6,375,000 per year.

By a 6–1 vote of its members, the Commission denied the County's test claim for two independent reasons. First, it found the "plain language" of the Test Claim Statutes does "not impose a state-mandated program on local agencies." According to the Commission, the Test Claim Statutes impose duties on the Board, a State agency, but they do not impose activities on local governments. The Commission emphasized that, although "the *courts* have identified procedures to implement the [T]est [C]laim [S]tatutes," section 6 requires reimbursement only for legislative or agency mandates, and the Legislature "has *not* enacted any laws to specify what evidence-gathering procedures should be afforded to youth offenders."

Second, as an alternative basis for denying the test claim, the Commission found the Test Claim Statutes changed the penalties for crimes and thus satisfied Government Code section 17556, subdivision (g). As noted, that provision states that costs are not mandated, and reimbursement from the State is not required, when a "statute create[s] a new crime or infraction,

17

eliminate[s] a crime or infraction, or change[s] the penalty for a crime or infraction, but only for that portion of the statute relating directly to the enforcement of the crime or infraction." (Gov. Code, § 17556, sub. (g).) The Commission reasoned this exception applied because the Test Claim Statutes "capp[ed] the number of years the offender may be imprisoned before becoming eligible for release on parole, and all of the activities alleged in this case to comply with the [T]est [C]laim [S]tatutes, including the resultant *Franklin* proceedings, relate directly to the enforcement of the youthful offender's underlying crime."[8]

The County petitioned the trial court for a writ of administrative mandate compelling the Commission to set aside its denial of the test claim. After receiving written submissions from all parties, including the County, the Commission, and the real parties in interest,[9] the trial court denied the County's petition. Like the Commission, the court found reimbursement was unwarranted because the Test Claim Statutes "contain no mandate directed to any local government." The court adopted the Commission's alternative basis for denying the test claim as well, finding the County was not entitled

---

[8] In briefing filed with the Commission, the parties raised competing arguments concerning the applicability of Government Code section 17556, subdivisions (b) and (c). Those statutory provisions state that reimbursement from the State is not required when a "statute or executive order affirm[s] for the state a mandate that has been declared existing law or regulation by action of the courts," (Gov. Code, § 17556, subd. (b)), or when a "statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government" (*id.*, subd. (c)). The Commission did not reach the issue of whether these statutory exceptions apply to the Test Claim Statutes.

[9] The real parties in interest are the State of California Department of Finance and Betty T. Yee, in her official capacity as the California State Controller.

to reimbursement because the Test Claim Statutes changed the penalties for crimes perpetrated by eligible youth offenders.

The County appeals the trial court's determination.

III

DISCUSSION

1. *Standard of Review*

" 'Courts review a decision of the Commission to determine whether it is supported by substantial evidence.  [Citation.]  Ordinarily, when the scope of review in the trial court is whether the administrative decision is supported by substantial evidence, the scope of review on appeal is the same.  [Citation.]  However, the appellate court independently reviews conclusions as to the meaning and effect of constitutional and statutory provisions.  [Citation.]  The question whether a statute or executive order imposes a mandate is a question of law.' " (*CCCD, supra*, 13 Cal.5th at p. 814.)

2. *The Test Claim Statutes Change the Penalties for Crimes and Therefore Fall Within a Statutory Exception to the Reimbursement Requirement*

The parties present competing arguments as to whether the Test Claim Statutes impose mandates on the County and other local governments to carry out new programs or higher levels of service.  If they do impose such mandates, the local governments may be entitled to reimbursement from the State for any costs they incurred as a result of the legislative mandates, unless an exception to the mandatory reimbursement requirement applies. (Cal. Const., art. XIII B, § 6; Gov. Code, §§ 17514, 17561, subd. (a).)  If they do not impose such mandates, the affected local governments would not be entitled to mandatory reimbursement from the State.

The County asserts the Test Claim Statutes mandate *Franklin* proceedings because *Franklin* proceedings "derive[] from" the Test Claim

19

Statutes.  (*Cook, supra*, 7 Cal.5th at p. 459; see *id.* at p. 449 ["*Franklin* authorized postjudgment proceedings to effectuate [the] intent" of the Test Claim Statutes].)  The County claims it is compelled to prepare for, and attend, *Franklin* proceedings—and it incurs costs in the process of doing so—because county-employed public defenders and district attorneys have non-discretionary constitutional duties to represent their clients in critical stages of criminal proceedings.  (U.S. Const., 6th Amend.; Cal. Const., art. V, § 13.)

By contrast, the Commission and the real parties in interest argue the Test Claim Statutes do not impose mandates on local governments; rather, they require the Board, a state agency, to conduct youth offender parole hearings.  The Commission and the real parties in interest maintain that *Franklin* proceedings are judicially crafted proceedings, which the Legislature did not expressly mandate through the Test Claim Statutes or otherwise.  (See *Cook, supra*, 7 Cal.5th at p. 459 [opining that the Legislature "remains free ... to specify what evidence-gathering procedures should be afforded to youth offenders"]; see also *id.* at pp. 460–461 (conc. & dis. opn. of Kruger, J.) ["we have never held that the specific record-preservation procedures we ordered in *Franklin*, including the opportunity to present live testimony, are required either by the terms of the [Test Claim S]tatutes or by the constitutional guarantee they are designed to implement"].)

We need not decide whether the Test Claim Statutes impose a mandate on local governments and, if so, whether the alleged mandate requires local governments to carry out a new program or a higher level of service—issues that present thorny questions about the very nature of *Franklin* proceedings. Assuming arguendo that the Test Claim Statutes compel local governments to provide a new program or a higher level of service, we conclude the Commission and the trial court properly denied the County's reimbursement

20

claim because the Test Claim Statutes fall within the exception to mandatory reimbursement codified in Government Code section 17556, subdivision (g).

As noted, Government Code section 17556, subdivision (g), provides, "The commission shall not find costs mandated by the state, as defined in [Government Code] Section 17514, in any claim submitted by a local agency or school district, if, after a hearing, the commission finds any one of the following: [¶] The statute created a new crime or infraction, eliminated a crime or infraction, or changed the penalty for a crime or infraction, but only for that portion of the statute relating directly to the enforcement of the crime or infraction." (See also Cal. Const., art. XIII B, § 6, subd. (a)(2) [no reimbursement is required for "Legislation defining a new crime or changing an existing definition of a crime."].)

The Test Claim Statutes fall within this statutory exception because they changed the penalties for crimes perpetrated by eligible youth offenders. Prior to the enactment of the Test Claim Statutes, youth offenders could be subject to the same lengthy—and often mandatory—prison sentences that were imposed on adult offenders. (See *Franklin, supra*, 63 Cal.4th at p. 272 ["Once a juvenile offender is tried and convicted in criminal court, the trial court may be statutorily obligated to impose a lengthy sentence."].) The Test Claim Statutes changed this practice for most youth offenders. Now, as a direct result of the Test Claim Statutes, most youth offenders are statutorily eligible for parole at a youth offender parole hearing conducted during the 15th, 20th, or 25th year of incarceration, depending on the term of incarceration included within the youth offender's original sentence. (Pen. Code, §§ 3046, subd. (c), 3051, subds. (b), (d), 4801, subd. (c).) In practice, this parole eligibility ensures that some youth offenders will be released from

prison years earlier, and perhaps even decades earlier, than they otherwise would have been but-for the Test Claim Statutes.

Thus, the Test Claim Statutes, and the youth offender parole hearing system established thereunder, "superseded the statutorily mandated sentences of inmates who ... committed their controlling offense" when they were under the age of 26. (*Franklin, supra*, 63 Cal.4th at p. 278.) Stated differently, the laws "effectively reform[ed] the parole eligibility date of a [youth] offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Id.* at p. 281; see *People v. Ngo* (2023) 89 Cal.App.5th 116, 125 ["section 3051 *is*, in part, a sentencing statute"]; *People v. Sands* (2021) 70 Cal.App.5th 193, 205 [section 3051 " 'impacts the length of sentence served.' "]; *In re Hoze* (2021) 61 Cal.App.5th 309, 315 ["For youth offenders granted parole under section 3051, the statute overrides their original, statutorily mandated sentences."]; *People v. Scott* (2016) 3 Cal.App.5th 1265, 1281 ["section 3051 has abolished de facto life sentences"].) By guaranteeing parole eligibility for most youth offenders, and overriding those offenders' original sentences, the Test Claim Statutes change the penalties for crimes within the meaning of Government Code section 17556, subdivision (g).

The County raises four arguments as to why the Test Claim Statutes do not change the penalties for crimes. First, it asserts the Test Claim Statutes do not change the penalties for crimes because they do not vacate youth offenders' original sentences. It is true the Test Claim Statutes do not vacate youth offenders' sentences, nor do they require resentencing proceedings. (*Franklin, supra*, 63 Cal.4th at p. 278; *People v. White* (2022) 86 Cal.App.5th 1229, 1238–1239.) But these facts do not mean the Test Claim Statutes effect no change on the penalties suffered by youth offenders. The

Test Claim Statutes "change[] the manner in which the juvenile offender's original sentence *operates* by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole.  The Legislature has effected this change *by operation of law*, with no additional resentencing procedure required." (*Franklin*, at pp. 278–279, italics added; *id.* at p. 281 ["by operation of law, [the defendant] is entitled to a parole hearing and possible release after 25 years of incarceration"].)  In short, by changing the manner in which the original sentences operate, and guaranteeing youth offenders the chance to obtain release on parole, the Test Claim Statutes—by operation of law—alter the penalties for the crimes perpetrated by eligible youth offenders.

Second, the County argues the Test Claim Statutes do not change the penalties for the crimes perpetrated by eligible youth offenders because those penalties were changed before the Test Claim Statutes went into effect—by the *Graham*, *Miller*, and *Caballero* decisions interpreting the Eighth Amendment.  The County is mistaken.  To be sure, these important Eighth Amendment decisions served as the impetus for the Legislature's enactment of the Test Claim Statutes.  (Stats. 2013, ch. 312, § 1; *Franklin, supra*, 63 Cal.4th at p. 277.)  But they did not change the penalties for any crimes. Even after the U.S. Supreme Court and the California Supreme Court issued these Eighth Amendment decisions, youth offenders in California remained subject to the sentences originally imposed on them, with no automatic statutory right to parole eligibility.  Only after the Test Claim Statutes were enacted did eligible youth offenders automatically, and by operation of law, become eligible for parole.  It was these legislatively-enacted statutes—not the Eighth Amendment judicial decisions themselves—that changed the penalties for the crimes perpetrated by youth offenders in our State.

23

Third, the County contends the Test Claim Statutes do not change the penalties for crimes because they simply implement so-called "procedural" and "administrative" changes. This argument is without merit as well. As discussed above, the Test Claim Statutes guarantee parole eligibility for qualified youth offenders. Parole is not a mere "procedural" or "administrative" facet of the criminal justice system. "[P]arole *is* punishment." (*In re Palmer* (2021) 10 Cal.5th 959, 976; see *Samson v. California* (2006) 547 U.S. 843, 850 ["parolees are on the 'continuum' of state-imposed punishments"]; *People v. Nuckles* (2013) 56 Cal.4th 601, 609 (*Nuckles*) [parole is generally "acknowledged as a form of punishment"].) In fact, "parole is a mandatory component of any prison sentence. 'A sentence resulting in imprisonment in the state prison ... shall include a period of parole supervision or postrelease community supervision, unless waived ....' ([Pen. Code,] § 3000, subd. (a)(1).) Thus, a prison sentence 'contemplates a period of parole, which in that respect is related to the sentence.' " (*Nuckles*, at p. 609.) By guaranteeing parole eligibility for all qualified youth offenders, the Test Claim Statutes altered the substantive punishments, i.e., the penalties, for the offenses perpetrated by those offenders.

Finally, the County argues reimbursement is required, at minimum, for costs it incurs to comply with at least one statutory provision composing the Test Claim Statutes—namely, Penal Code section 3051, subdivision (f). The County argues that statutory provision does not relate directly to the enforcement of a crime. As stated above, reimbursement is mandatory when a statute changes the penalty for a crime, "but only for that portion of the statute relating directly to the enforcement of the crime or infraction." (Gov. Code, § 17556, subd. (g).) Once more, we disagree with the County.

24

Penal Code section 3051, subdivision (f), identifies the evidence that may be introduced and considered when the Board assesses a parole candidate's growth, maturity, and overall parole suitability. (Pen. Code, § 3051, subd. (f)(1), (2).) Because it dictates the evidence and information the Board may, or must, assess when determining a candidate's parole suitability, it plays an indispensable role in the youth offender parole hearing scheme. Indeed, in practice, it very well may be determinative as to whether a given youth offender will be released on parole. Further, there can be no dispute that parole flows directly from the parolee's underlying crime. (See *Nuckles, supra*, 56 Cal.4th at p. 609 ["parole is a form of punishment accruing directly from the underlying conviction"]; *ibid.* ["Being placed on parole is a direct consequence of a felony conviction and prison term."]; see also *People v. VonWahlde* (2016) 3 Cal.App.5th 1187, 1194 [parole "is 'a direct and, pragmatically, an inexorable penal consequence' " of a criminal conviction].) Because Penal Code section 3051, subdivision (f), plays a pivotal role in the Board's parole determination, and parole is a direct consequence of a criminal conviction, we conclude section 3051, subdivision (f)—like the other statutory components that make up the Test Claim Statutes—directly relates to the enforcement of the crimes perpetrated by eligible youth offenders.

In sum, we conclude the Test Claim Statutes change the penalties for crimes perpetrated by youth offenders who are, thanks to the Test Claim Statutes, now eligible for a parole hearing in their 15th, 20th, or 25th year of incarceration. Since the Test Claim Statutes change the penalties for crimes, they fall within the statutory exception to the mandatory reimbursement requirement codified in Government Code section 17556, subdivision (g). And, because they are not subject to the mandatory reimbursement

requirement, we agree with the trial court's determination that the Commission properly denied the County's test claim.[10]

## IV

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

DO, J.

---

[10] In its opening brief, the County implies Government Code section 17556, subdivision (g) is unconstitutional because it is broader than section 6, subdivision (a)(2), of Article XIII B of the California Constitution, which creates a reimbursement exception for "[l]egislation defining a new crime or changing an existing definition of a crime." However, in its reply brief, the County expressly disclaims that it is challenging the constitutionality of Government Code section 17556, subdivision (g). Because the County makes no argument about the constitutionality of Government Code section 17556, subdivision (g), we do not address the issue.