Filed 8/30/24  P. v. Singer CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B328766 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA073169) |
| v. | |
| HENRY ARNOLD SINGER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Jacqueline H. Lewis, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Stephanie A. Miyoshi and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Henry Arnold Singer was one of three individuals charged with the first degree murder of a college student who was kidnapped, robbed and left for dead in the San Gabriel mountains in August 2001. Defendant pled guilty to first degree murder in exchange for a dismissal of the special circumstance allegations and agreed to testify against his codefendants. In accordance with the plea agreement, defendant was sentenced to 25 years to life in prison.

In February 2019, defendant filed in propria persona a form petition for resentencing pursuant to Penal Code section 1172.6 (former § 1170.95). At the October 29, 2019 evidentiary hearing, the court denied defendant's petition, finding the evidence demonstrated defendant could still be convicted under the amended murder statutes. In an unpublished decision, we affirmed. (*People v. Singer* (Sept. 30, 2020, B302163) [nonpub. opn.].) In 2022, defendant filed two more, largely identical, form petitions for resentencing. The trial court summarily denied both based on the fact the court had already denied the relief defendant sought after conducting an evidentiary hearing.

Defendant appeals from the summary denial of his third resentencing petition in January 2023. He contends the trial court erred in denying his third petition as procedurally barred because, at the hearing on his first petition in 2019, the court did not consider his age as a factor in assessing his culpability for felony murder. Defendant says the law now requires youth to be considered and that a remand for a new evidentiary hearing is therefore warranted.

We affirm.

**FACTUAL AND PROCEDURAL SUMMARY**

In April 2006, defendant and codefendant Markeisha Dixon were charged with the first degree murder of college student Christina Burmeister. (Pen. Code, § 187, subd. (a).) Robbery-murder and kidnapping-murder special circumstances were also alleged. (§ 190.2, subd. (a)(17).) In a separate information, James Dixon was also charged with the Burmeister murder. Because of the common surname, we refer to Markeisha Dixon as Markeisha and James Dixon as Dixon for clarity.

In November 2007, defendant pled guilty to first degree murder. As part of the plea agreement, the prosecution agreed to dismiss the special circumstance allegations and defendant agreed to testify against Dixon and Markeisha. Defendant's sentencing was deferred until after he testified at Dixon's trial. Markeisha pled guilty to first degree murder the day after defendant's plea.

On April 4, 2008, in accordance with the terms of the plea agreement, defendant was sentenced to prison for 25 years to life. The special circumstance allegations and the allegation defendant had suffered a prior strike conviction in 2002 for robbery were dismissed. Defendant was awarded 834 actual days of presentence custody credits.

## 1. The First Petition and Appeal

After the passage of Senate Bill 1437 (2017-2018 Reg. Sess.), defendant filed, in propria persona, his first form petition pursuant to Penal Code section 1172.6. The trial court appointed defendant counsel, the parties submitted briefs and the court issued an order to show cause.

The evidentiary hearing on defendant's petition was held on October 29, 2019. The court said it had considered the record

3

of conviction, including the abstract of judgment, the information, and the transcript of the preliminary hearing, and had also read the transcript of defendant's testimony in the Dixon case, which had been submitted as an exhibit to defendant's brief. Defendant agreed that was the relevant evidence to be considered by the court and that there was no new evidence to present. The prosecutor also did not offer any new evidence but objected to the consideration of defendant's testimony. The court overruled the objection.

Our summary of the evidence considered by the court at the evidentiary hearing is taken from our prior opinion in *People v. Singer*, *supra*, B302163. The evidence included the preliminary hearing testimony of Sergeant Joseph Purcell of the Los Angeles County Sheriff's Department, who investigated the Burmeister murder, and Chanson Tyrone, a witness to the crimes, as well as defendant's testimony from the trial of codefendant Dixon.

On August 18, 2001, Ms. Burmeister's body was discovered in the front passenger seat of her truck on a gravel turnout on Highway 39 in Azusa Canyon. Her throat had been cut. An autopsy later determined the cause of death to be a knife wound to the throat, causing the victim to have "drowned on her own blood." DNA testing performed on a cigar butt discovered on the floorboard beneath the driver's seat of the victim's truck matched the DNA profile for Dixon. The investigation also revealed that three ATM withdrawals, totaling $400, were made from Ms. Burmeister's account at Washington Mutual bank within the span of 90 seconds on the evening of August 17, 2001. Security footage from the bank showed a person making the withdrawals holding the hood of their sweatshirt down to obscure their face.

4

Mr. Tyrone testified he was with defendant on the night of August 17, 2001, in San Bernardino when they ran into Dixon and Markeisha. Mr. Tyrone knew Markeisha because she lived in his apartment building. Markeisha asked if they wanted to go get some "cheese," a slang term for money.

The four drove to Pomona. Markeisha was driving and stopped the car on a residential street where some sort of party was going on. Mr. Tyrone noticed Dixon had a handgun in his lap. Markeisha and Dixon got out of the car and walked off. Mr. Tyrone and defendant stayed by the car, talking and smoking cigarettes.

After a few minutes, Dixon returned with Ms. Burmeister, whom Mr. Tyrone did not know. Ms. Burmeister was walking next to Dixon and holding her hands up. They walked toward a blue truck and both Dixon and Ms. Burmeister got in the passenger side of the truck. Markeisha said "come on" and then got in the driver's seat of the truck and drove off.

Defendant and Mr. Tyrone, in the car they had come in, followed the truck, eventually arriving at a Washington Mutual bank in Montclair. Markeisha, who was wearing a black hooded shirt, got out of the truck and walked toward the ATM machine. She never said what she was going to do, but it was "pretty easy to figure out." When she was walking back from the ATM, she had money in her hands and was counting it.

Markeisha walked over to defendant and Mr. Tyrone and told them she was having difficulty driving the truck because it was a manual transmission. Defendant, who knew how to drive a manual transmission, got into the truck and drove out of the parking lot, followed by Markeisha and Mr. Tyrone. They drove to "a secluded little dark area" up in the mountains. Markeisha

parked the car a little bit away from where defendant parked the truck. Defendant got out of the victim's truck, walked over to the car and got in with Markeisha and Mr. Tyrone. Mr. Tyrone could see that Dixon was still in the truck with Ms. Burmeister. After a few moments, he saw Ms. Burmeister appear to grab at her neck "like she was gasping for air or something." Dixon got out of the truck and came back to the car. Mr. Tyrone did not see any weapon in his hands. Markeisha then drove them all back to San Bernardino.

Defendant's testimony at Dixon's trial differed from Mr. Tyrone's preliminary hearing testimony in several respects but otherwise substantially corroborated the evidence of defendant's role in committing the crimes.

Defendant said he and Mr. Tyrone were driving around that evening when they saw Markeisha and Dixon and stopped to talk to them. Dixon asked for a ride to Pomona. Defendant said he did not have enough gas to drive there and Dixon offered to pay. During the drive to Pomona, Dixon suggested they make some money by selling drugs once they arrived. All four of them shared a blunt (a cigar with marijuana rolled inside). Once in Pomona, defendant followed Dixon's directions to a residential location and parked the car.

Markeisha and Dixon got out of the car, said they would be right back and walked away. Defendant and Mr. Tyrone stayed by the car and finished smoking the blunt. Five to 10 minutes later, Markeisha and Dixon returned, driving a blue truck. They pulled up next to defendant and told him to follow them. Defendant followed the truck to a bank in Montclair. Defendant parked his car a few spaces away from the truck. Defendant saw Markeisha, who was wearing a hooded sweatshirt, walk over

6

toward the bank.  Shortly thereafter, Markeisha came over to the car.  Mr. Tyrone pointed out that a police car was driving through the parking lot.  They all walked a short distance away and watched the police car.  Markeisha said they needed to get the truck out of the parking lot.

After the police car left, they walked back to the truck and Markeisha said she was having trouble driving it because it had a manual transmission.  She asked defendant to drive it and he agreed.  Markeisha told him there was a "white girl" in the truck or words to that effect.

Before getting into the truck, defendant got a pair of socks from the trunk of his car and put them on his hands because he did not want to leave fingerprints in the truck.  When defendant got into the truck, he noticed that Dixon was not inside and that there was a white female (Ms. Burmeister) lying face down on the floor of the back cab area, with her shirt pulled up over her head and her hands tied behind her back with red lace fabric, apparently her underwear.  She was "gasping," "moan[ing] in discomfort" and "struggling" to move.  Defendant did not ask if she was alright or do anything to help her.

Defendant, driving Ms. Burmeister's truck, followed the car now driven by Mr. Tyrone with Markeisha as a passenger, out of the parking lot.  Defendant saw Dixon standing on the side of the road and stopped to pick him up.  Before getting in, Dixon pulled Ms. Burmeister from the backseat and put her in the front passenger seat and then climbed into the back behind her.  Defendant asked Dixon what was going on and he pulled out a handgun and told him not to worry about it.  Ms. Burmeister told them to take what they wanted and leave her alone or words to that effect.

When asked why he did not drive away from the others before picking up Dixon, knowing Ms. Burmeister was tied up and in need of assistance, defendant said "foul judgment" and because he was "stoned." Defendant also said he feared Dixon might use the gun, but conceded Dixon did not point the gun at him or threaten him with it.

Defendant followed Dixon's directions to drive up into the mountains of Azusa Canyon. Eventually, Dixon pointed out a dark turnout area and told defendant to pull over. Defendant parked the truck and got out, leaving Dixon in the truck with Ms. Burmeister. Defendant walked over to the car and joined Markeisha and Mr. Tyrone. Defendant saw Dixon get out of the truck and then lean back into it, before closing the door. As he walked toward defendant's car, Dixon appeared to throw something. Dixon told defendant to leave and gave him directions back to the freeway. Dixon told Mr. Tyrone to throw Ms. Burmeister's cell phone out the window, and he did so.

After entertaining argument from the parties, the court denied defendant's petition, finding the evidence supported the conclusion that, whether analyzed as express malice, implied malice or reckless indifference, defendant would be found guilty under current law and therefore was ineligible for resentencing.

Defendant appealed. In affirming the trial court's denial of relief, we concluded the record "amply support[ed] defendant's guilt of first degree felony murder on a theory he was a 'major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Singer*, *supra*, B302163.)

## 2. The Second and Third Petitions

In June 2022, defendant filed, in propria persona, a second form petition pursuant to Penal Code section 1172.6, largely

identical to his first petition. The court summarily denied the petition as a duplicative, successive petition. Defendant did not appeal. Shortly after defendant's second petition was denied, the court accepted receipt of a packet of materials on behalf of defendant in accordance with Penal Code section 3051. The court ordered the original to be transmitted to the Department of Corrections and Rehabilitation for use in future parole hearings, including a youthful offender hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261.

In December 2022, defendant filed his third form petition in propria persona. Defendant did not cite any change in the law regarding youthful adult offenders or cite any new evidence regarding his age or the age of his accomplices that he contended the court should consider. On January 26, 2023, the trial court summarily denied the petition "with prejudice," stating that "defendant previously sought relief and the petition was previously reviewed and denied" and "the defendant is not entitled to an additional hearing."

Defendant filed this appeal from the denial of his third petition. We grant defendant's request to take judicial notice of our opinion affirming the denial of his first petition. (*People v. Singer, supra*, B302163.)

## DISCUSSION

### 1. Procedural Issues

Defendant does not cite any authority that the Legislature, in enacting Penal Code section 1172.6, intended for defendants to be entitled to multiple evidentiary hearings in perpetuity. However, some courts recently have held there are circumstances that permit a defendant to file more than one petition for resentencing.

9

In *People v. Farfan* (2021) 71 Cal.App.5th 942 (*Farfan*), the court held that the defendant's second petition for resentencing pursuant to Penal Code section 1172.6, filed after a summary denial at the prima facie stage, was not procedurally barred, explaining that "[n]either the express language of section [1172.6] nor the stated purpose of the legislation supports limiting access to relief . . . where, as here, the subsequent petition rested on new legal authority which challenged the basis for the superior court's summary denial of the previous petition." (*Farfan,* at pp. 946-947.)

After briefing in this appeal was completed, defendant sent a letter citing *People v. Jimenez* (2024) 103 Cal.App.5th 994 (*Jimenez*) which reversed the denial of a second petition for resentencing. The defendant's first petition was denied after an evidentiary hearing and that denial was affirmed on appeal. After the passage of Senate Bill 775 (2021-2022 Reg. Sess.), Jimenez filed a second resentencing petition which the trial court denied at the prima facie stage, finding there was no legal authority entitling Jimenez to a second resentencing petition and the changes in the law did not apply to Jimenez as a direct aider and abettor. (*Jimenez,* at p. 1000.) *Jimenez* remanded for a new evidentiary hearing, concluding there had been a substantive change in the law regarding youthful adult offenders and that neither collateral estoppel nor the doctrine of law of the case barred proceedings on a second petition. (*Id.* at pp. 997-998, 1004-1005, 1006.)

Defendant, relying on *Farfan* and *Jimenez*, contends his third petition was likewise not procedurally barred and should have been considered on the merits because of the substantive change in the law regarding youthful offenders after the court

10

resolved his first petition in 2019.  Defendant argues that courts have only recently begun to consider an offender's age as a relevant factor in assessing the reckless indifference standard for murder liability, and that he is entitled to a new evidentiary hearing at which the court considers his age at the time of the crimes in assessing his culpability.

The People contend the doctrines of issue preclusion and law of the case support the trial court's ruling that defendant's third petition was procedurally barred.  The People concede that both doctrines will generally not be applied where there has been a substantive change in the law, but they say there has been no such change here.  The People contend that state and federal courts have long recognized the relative emotional and mental immaturity of youthful offenders in assessing culpability and imposing punishment, citing to cases such as *Graham v. Florida* (2010) 560 U.S. 48 and *People v. Gutierrez* (2014) 58 Cal.4th 1354.  While not actually arguing forfeiture, the People also point out that defendant's third form petition, filed in December 2022, did *not* cite any change in the law as a basis for consideration.

The People are correct that defendant did not cite any change in the law as a basis for considering his third petition. Defendant first asserted he should be entitled to a new evidentiary hearing due to his age at the time of the murder— 23—in this appeal.  As for the People's first point, *Jimenez* appears to be the first published decision discussing the doctrines of issue preclusion and law of the case in this context.

We express no opinion on *Jimenez* and decline to resolve today whether defendant is entitled to a second evidentiary hearing due to a subsequent change in the law (even though he did not ask or give the trial court the opportunity to consider the

11

asserted change in the law).  We conclude that even assuming the trial court erred in denying the third petition as procedurally barred, the error was harmless because defendant has not shown any prejudice.

## 2.    Defendant Has Not Established Prejudice

Where, as here, an error is purely one of state law, we apply the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Epps* (2001) 25 Cal.4th 19, 29; accord, *People v. Lewis* (2021) 11 Cal.5th 952, 973-974 [failure of court to appoint counsel at prima facie stage of Pen. Code, § 1172.6 petition is judged under *Watson* standard for state law error]; *People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1239 [applying *Watson* test in context of § 1172.6 proceeding]; *People v. Oliver* (2023) 90 Cal.App.5th 466, 489, fn. 8 (*Oliver*) [same]; *People v. Myles* (2021) 69 Cal.App.5th 688, 706 [same].)  Defendant must demonstrate there is a reasonable probability that in the absence of the error, he would have obtained a more favorable result.  (*Watson*, at p. 836.)  Defendant has not done so.

Defendant argues there is no evidence of two of the factors identified in *People v. Banks* (2015) 61 Cal.4th 788, 803 as relevant to assessing whether a defendant has acted "with reckless indifference to human life" within the meaning of Penal Code section 190.2, subdivision (d).  He claims there is no evidence he planned the crimes or knew that Dixon, in addition to the handgun, also had a knife which was the weapon ultimately used to kill Ms. Burmeister.  But in clarifying the evidentiary contours of the reckless indifference analysis, *Banks* made clear that none of the nonexhaustive list of factors is required to be present or is dispositive of the ultimate question of guilt.  (*Banks,* at p. 803.)  More importantly, defendant does not

12

explain the relevance of age to these factors in the specific factual context of this case.

The only other argument defendant makes is his claim that "youthful impulsivity and peer pressure were paramount factors" in the case, but he cites to no evidence supporting a finding of either. Defendant was *not* a juvenile at the time of the crimes in August 2001. He was a 23-year-old adult, on the high end of the definition of youthful offender acknowledged by most courts and used in Penal Code section 3051 as the cutoff for youthful offender parole hearings (25 years old and under). We agree with *Oliver* that "[p]resumably, the presumption of immaturity weakens as a defendant approaches 26." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489.)

The *Jimenez* court found denial of a second evidentiary hearing to consider the defendant's age was prejudicial because Jimenez was 19, the actual shooter was Jimenez's girlfriend and she was only 20, and there was evidence suggesting defendant acted under peer pressure or could have been swept up in circumstances beyond his control. (*Jimenez*, *supra*, 103 Cal.App.5th at pp. 1007-1008.)

In contrast, no evidence in this case suggests defendant acted out of impulsivity or peer pressure. The evidence of defendant's guilt, much of which came from defendant's own testimony, was that, when Markeisha told defendant after the robbery that she was having trouble driving the truck because of the manual transmission, defendant agreed to drive it from the bank parking lot to a remote area at night. Before getting into the truck, defendant got a pair of socks from the trunk of his car and put them on his hands because he did not want to leave fingerprints in the truck. When defendant got into the truck, he

13

saw the victim was bound, face down, on the floor of the truck's back cab and was "gasping," "moan[ing]" and "struggling" to move. Defendant did not protest in any way or back out of his agreement to drive the vehicle.

Defendant was alone with the victim as he drove out of the parking lot and he could have driven off, leaving the others behind and taking the victim to a place of safety. He chose not to do so. Instead, defendant stopped and picked up Dixon and drove a significant distance to a secluded mountain location. Once up in the mountains, he left the victim alone in the truck with Dixon, knowing Dixon had a handgun. After Dixon slit the victim's throat, defendant drove all the accomplices from the scene of the crime. Once back home, defendant did nothing to summon aid for the victim.

Defendant blamed being "stoned" for his poor judgment that evening, not that he felt coerced or threatened or that he succumbed to peer pressure. Defendant also did not identify any new evidence that could be presented demonstrating that his age at the time of the crimes impacted his participation that night. Defendant has not shown there is a reasonable probability of a more favorable outcome. He has not shown prejudice from the court's denial.

## DISPOSITION

The order denying defendant and appellant's Henry Arnold Singer's third petition for resentencing is affirmed.


GRIMES, J.

WE CONCUR:


STRATTON, P. J.          WILEY, J.


14